**BETHLEHEM STEEL CORPORATION, Petitioner,**

v.

**Russell E. TRAIN, Administrator of the Environmental Protection Agency, Respondent.**

**No. 75–2452.**

United States Court of Appeals, Third Circuit.

Argued Sept. 8, 1976.

Decided Nov. 1, 1976.

As Amended Nov. 10, 1976.

**658**

_____

John McN. Cramer, Reed, Smith, Shaw & McClay, Pittsburgh, Pa., for petitioner.

Peter R. Taft, Asst. Atty. Gen., Alfred T. Ghiorzi, Thomas A. Pursley III, Attys., Dept. of Justice, Robert V. Zener, Gen. Counsel, Barry L. Malter, Atty., EPA, Washington, D. C., John Buffington, Atty., EPA, Philadelphia, Pa., for respondent.

**1.** 33 U.S.C. §§ 1251 *et seq.* (Supp. III 1973).

**2.** *Id.* § 1251(a). We are providing only a thumbnail sketch of FWPCA. For more complete descriptions, *see American Iron & Steel Institute v. EPA*, 526 F.2d 1027, 1035–42 (3d Cir. 1975); *Natural Resources Defense Council,*

Eben H. Cockley, Ronald R. Janke, Jones, Day, Reavis & Pogue, Cleveland, Ohio, for amicus curiae Republic Steel Corp.; James D. Donohoe, Cleveland, Ohio, of counsel.

Before ADAMS, ROSENN and GARTH, Circuit Judges.

## OPINION OF THE COURT

ADAMS, Circuit Judge.

This case involves an important question regarding the interpretation of the Federal Water Pollution Control Act (FWPCA).[1] We must determine whether the Environmental Protection Agency (EPA) may issue a permit which would allow dischargers to comply with effluent limitations at a time subsequent to July 1, 1977, the date set forth in the legislation.

### I.

FWPCA encompasses a complex statutory scheme that seeks "to restore and maintain the chemical, physical and biological integrity of the nation's waters" in order to achieve a "national goal that the discharge of pollutants into the navigable waters be eliminated by 1985."[2]

Three interrelated provisions form the heart of the program and are the focus of this litigation. Section 301(b)[3] establishes two stages of effluent limitations. The stage relevant to our present inquiry is the requirement of conformity by July 1, 1977 with "effluent limitations for point sources . . . which shall require the application of the best practicable control technology currently available as defined by the Administrator pursuant to section 304(b) of this Act . . . ." Section 304(b)(1)(A),[4] in turn, mandates the EPA to promulgate guidelines for emissions by certain indus-

*Inc. v. Train*, 166 U.S.App.D.C. 312, 510 F.2d 692, 695–98 (1975).

**3.** 33 U.S.C. § 1311(b) (Supp. III 1973).

**4.** *Id.* § 1314(b)(1)(A).

tries, including the iron and steel industry, by October 18, 1973. The third provision, section 402,[5] establishes the National Pollutant Discharge Elimination System (NPDES) permits as the primary means through which effluent limitations are to be enforced. All discharges of pollutants must be authorized by a permit issued by either the EPA or the state environmental authorities. Subsection (a)(1) of section 402[6] states that the permits are to be conditioned on conformity with all applicable requirements of certain other statutory provisions, including section 301. It is further provided that all permits must be issued by December 31, 1974.[7]

Thus, the legislative structure is that general standards of pollution control are to be promulgated under sections 301 and 304, and that these standards are then to be implemented in particular cases through the use of section 402 permits.

The sequence of administrative action contemplated by Congress has never taken hold in the iron and steel industry. The section 304 guidelines for that industry were not established by October 18, 1973; indeed, none are in force today.[8] As a result, permits have been issued to iron and steel manufacturers under a clause of section 402(a)(1) that empowers the EPA to grant permits, on an interim basis, before formal guidelines are promulgated.[9]

## II.

On December 31, 1974, the EPA issued a permit to Bethlehem, pursuant to its stopgap authority, containing effluent limitations and compliance schedules, and requiring attainment of final compliance levels by July 1, 1977.[10] For Bethlehem to meet this deadline it would have to complete extensive construction by April 1, 1977, an accomplishment which Bethlehem has insisted is physically impossible in spite of good faith compliance efforts.[11] The earliest date by which it could meet the prescribed levels would be July 1, 1979.[12] Bethlehem fully pursued its administrative remedies in an attempt to obtain an extension of the compliance date. Although EPA agreed that compliance by July 1, 1977 was not feasible, it ruled at all stages that it was without power under FWPCA to grant an extension.[13]

A significant development occurred subsequent to the filing of the petition for review in the present case that bears heavily on the resolution of this proceeding. On June 3, 1976, EPA circulated a memorandum which stated that, in certain instances, it would not undertake enforcement actions against dischargers for failure to meet the July 1, 1977 deadline.[14] Recognizing that some industrial dischargers would be unable to conform, despite good faith efforts, the agency announced that if a discharger did

5. *Id.* § 1342.

6. *Id.* § 1342(a)(1).

7. *Id.* § 1342(k).

8. In *Natural Resources Defense Council, Inc. v. Train,* 166 U.S.App.D.C. 312, 510 F.2d 692 (1975), the United States Court of Appeals for the District of Columbia Circuit ruled that EPA was under a statutory obligation to promulgate guidelines for 27 enumerated industries, including iron and steel, and ordered EPA to issue these guidelines as expeditiously as possible. Indeed, it should be noted that EPA conceded that this was its responsibility. *See id.* at 704. EPA did issue Phase I guidelines for the iron and steel industry. However, they were set aside by this Court in *American Iron and Steel Institute v. EPA,* 526 F.2d 1027 (3d Cir. 1975). To this date, EPA has not published revised Phase I guidelines.

9. Section 402(a)(1) of FWPCA, 33 U.S.C. § 1342(a)(1) (Supp. III 1973) authorizes the Administrator to issue permits "prior to the taking of necessary implementing actions." In such cases, the permits are premised upon adherence to "such requirements, such conditions as the Administrator determines are necessary to carry out the provisions of this chapter."

10. *See* NPDES Permit Number PA 0011177.

11. *See* Stipulation of the Parties ⁋⁋ 8–10, App. at 70a–71a.

12. *See id.* at 71a.

13. These facts have been stipulated to by EPA and Bethlehem. *See* App. at 69a–71a.

14. *See* 7 BNA Environmental Law Reporter 241–42. (June 11, 1976).

not have a final permit, EPA would issue an Enforcement Compliance Schedule Letter (ECSL). The ECSL would specify a program requiring final Stage I effluent limitation levels at some time after July 1, 1977. EPA was careful to note, however, that the permit issued to recipients of an ECSL would contain the July 1, 1977 compliance date. EPA has continued to insist that it is without statutory power to alter the deadline. Rather, the EPA urges that the ECSL program is merely an exercise of its prosecutorial discretion.

In a letter commenting on the impact of the ECSL scheme on the present action, and at oral argument, EPA stated that Bethlehem, having already received a final permit, is not eligible for an ECSL. However, EPA informed us that its stipulation with Bethlehem has the same effect as an ECSL and that enforcement action was, perforce, highly unlikely.

This Court has jurisdiction pursuant to section 509(b)(1) of FWPCA,[15] which provides for review in the courts of appeals of action by the Administrator of EPA "in issuing or denying any permit under section 402."[16] After scrutinizing the contentions of the parties, we have decided that the petition for review must be dismissed.

### III.

As the first step in our analysis, we must explore the problem whether this case has become moot. As noted, EPA has told the Court that, because of the stipulation between the parties, it does not contemplate bringing enforcement action against Bethlehem when the projected failure to comply with the July 1, 1977 deadline comes to pass. Since the stipulation, however, does not obviate all the adverse consequences that might be visited upon Bethlehem because of its inability to conform to the deadline date, we conclude that a live case or controversy still exists.[17]

■ Two considerations shape our determination. Although EPA made clear that it had no intention to bring either a civil or a criminal action against Bethlehem, it conceded that it could not foreclose that possibility in the future. A more significant factor affecting the question of mootness, however, is the provision in section 505 of FWPCA[18] for citizen suits against dischargers which fail to comply with the terms of a permit. While a citizen must give the EPA advance notice of his intention to sue,[19] there is no authorization to block a citizen's suit under section 505 even though the agency believes that the suit should not go forward. Thus, the EPA–Bethlehem stipulation would not foreclose the possibility that a citizen could proceed with litigation seeking the imposition of sanctions because of Bethlehem's inability to comply with the statutory deadline. Accordingly, this case cannot be deemed moot and we must proceed to the merits.

### IV.

At the core of Bethlehem's argument on appeal is its contention that, in spite of the explicit provision of the July 1, 1977 deadline in the legislation, Congress could not possibly have intended to subject corporations to sanctions for failing to comply with time limits that proved to be unattainable. In such circumstances, it continues, Congress surely would intend for EPA to have the discretion to grant extensions to companies that were undertaking good faith compliance efforts.[20]

---

**15.** 33 U.S.C. § 1369(b)(1)(F) (Supp. III 1973).

**16.** Although the EPA granted Bethlehem a permit in this case, Bethlehem contends that one of the conditions in the permit is premised on an erroneous interpretation of FWPCA. Thus, Bethlehem seeks review of action taken in issuing a permit.

**17.** *See Preiser v. Newkirk*, 422 U.S. 395, 401, 95 S.Ct. 2330, 45 L.Ed.2d 272 (1975).

**18.** 33 U.S.C. § 1365.

**19.** 33 U.S.C. § 1365(b) provides that no citizen's suit may be filed unless the putative plaintiff has given the administrator at least 60 days' notice of his intention to sue.

**20.** In a similar vein, Republic Steel Corporation, as amicus, argues that the EPA's failure to issue guidelines for the iron and steel industry pursuant to the statutory mandate, *see* note 8

Bethlehem has not based its assertions on the text of the statute. Instead, in support of its position, it has directed our attention to several aspects of the legislative history. It states that the Phase I compliance date in early drafts of the legislation was July 1, 1976, and that for Phase II, July 1, 1981. Congress, however, pushed "these dates forward because of the time consumed in completing Congressional action."[21] Bethlehem insists that this amendment manifests a Congressional concern for the need of industry to have adequate time to plan and consummate compliance activity. It further maintains that this sensitivity should be interpreted as permitting the Administrator to bend the July 1, 1977 requirement when dischargers cannot meet that date through no fault of their own.

Bethlehem also asserts that the legislative history contains many statements indicating that Congress was attentive to the social and economic ramifications of the standards to be established under 301, 302 and 304 of FWPCA. In particular, it stresses the observations of Senator Randolph, a member of the Senate-House Conference Committee:[22]

"The Committee does not want to impose impossible goals, nor does it intend to require expenditures so excessive that they would undermine our economy. Consequently, under the proposed legisla-

tion, controls must relate the economic and social benefits to be gained with the economic and social costs to be incurred."

The draconian consequences of EPA's strict insistence on the July 1, 1977 deadline, Bethlehem contends, is inconsistent with Congressional awareness of the unwelcome economic impact of the overly zealous pursuit of environmental goals.

Although we are sympathetic to the plight of Bethlehem and similarly situated dischargers, examination of the terms of the statute, the legislative history of FWPCA and the case law has convinced us that July 1, 1977 was intended by Congress to be a rigid guidepost. The portions of the legislative history cited by Bethlehem speak to the economic and social consequences of the *substance* of guidelines established under sections 301, 302 and 304. Indeed, section 304(b)(1)(B) explicitly mandates that the Administrator is to consider social and economic costs in the context of assessing the best practicable control technology available.[23]

There are no comparable expressions of concern with the economic consequences of the July 1, 1977 date. Instead, all discussion of this date in the legislative history indicates that Congress viewed it as an inflexible target. The most important statement on the significance of the July 1, 1977

---

*supra*, is another factor that should lead us to hold that July 1, 1977 is not an absolutely rigid deadline. Republic maintains that by requiring that all guidelines be promulgated by October 18, 1973, and all permits issued by December 31, 1974, Congress indicated that dischargers were to be granted a minimum amount of "lead time" for planning and executing compliance strategies. EPA's tardiness, Republic asserts, thus entitles it to a reprieve from the July 1, 1977 deadline. It should be mentioned, however, that Bethlehem did receive its permit on December 31, 1974, the last day of the allowable period for permit issuance.

Bethlehem has also brought EPA's delay in promulgating guidelines to our attention, urging that it buttresses its assertion that Congress wrote many unrealistic compliance dates into FWPCA. It also submits that when EPA's action was challenged, the courts granted the agency a measure of relief. *See* Reply Brief at 6. We note, however, that the D.C. Circuit, in

*National Resources Defense Council, see* note 8 *supra*, ruled that EPA's failure to issue iron and steel guidelines pursuant to the Congressional timetable was improper.

**21.** *See* Environmental Policy Division of the Library of Congress, *A Legislative History of the Water Pollution Control Act Amendments of 1972*, 93d Cong., 1st Sess., (Comm. Print 1973) at 237. [Hereinafter cited as Legis.Hist.]

**22.** *Id.* at 1272. *See also id.* at 350 (remarks of Representative Blatnik); *id.* at 244, 352 (remarks of Representative Harsha).

**23.** *See* 33 U.S.C. § 1314(b)(1)(B) (Supp. III 1973) (stating that Administrator shall consider, *inter alia*, "total cost of application of technology in relation to the effluent reduction benefits to be achieved from such application.")

deadline was made by Senator Muskie, the principal author of FWPCA:[24]

> This does not mean that the Administrator cannot require compliance by an earlier date; it means that these limitations must be achieved no later than July 1, 1977, that they must be uniform and that they will be final upon the issuance of a permit under section 402 of the bill.

This view was echoed by Representative Jones, a member of the Senate-House Conference Committee:[25]

> It is the intention of the managers that the July 1, 1977 requirements be met by phased compliance and that all point sources will be in full compliance no later than July 1, 1977.

The import of these statements is reinforced by a further portion of the legislative history. H.R. 11896, the House version of the bill that ultimately became FWPCA, contained a provision authorizing EPA to extend the compliance deadline in cases where there was a showing of hardship upon the discharger.[26] The Senate bill, however, included no comparable clause. When the final version of the legislation emerged from the Conference Committee, it provided no authority for extension of the deadline for any reason whatsoever, and FWPCA as enacted also lacks such a mandate. The failure of a conference committee to include a portion of a bill proposed in one House is not a conclusive indicium of legislative intent.[27] But here, in light of the other segments of the legislative history, it leads to the conclusion that Congress did not authorize the EPA to deviate from the July 1, 1977 deadline for attainment of Phase I compliance levels.

We are aware that our interpretation of FWPCA may work a hardship on Bethlehem, which is doing everything within its power to achieve the required levels of effluent limitation as expeditiously as possible. However, the cases in general, and in the environmental field in particular, teach that the appropriate body from which to seek relief in situations such as the present one is the Congress.[28] Two recent decisions interpreting ecology statutes illustrate this proposition.

The Supreme Court examined a comparable problem in *Union Electric Co. v. EPA*,[29] a case which arose under the Clean Air Act. In *Union Electric*, the Court held that the EPA may not reject a state implementation plan on the grounds of economic and tech-

---

24. *See* Legis.Hist. at 162.

25. *See id.* at 231. *See also id.* at 1278 (remarks of Senator Bentsen).

26. Section 301(b)(3) of H.R. 11896 provided: The Administrator may extend for any point source the dates prescribed in subparagraphs (A) and (B) of paragraph (1) of this Subsection. No extension or extensions of such date shall exceed a total of two years from the date prescribed in such subparagraph. Public hearings must be held by the Administrator in connection with any such extension prior to granting such extension. No extension shall be granted unless the Administrator determines that it is not possible either physically or legally to complete the necessary construction within the statutory time limit.
Administration officials strongly supported the inclusion of such authority. Russell E. Train, then Chairman of the Council on Environmental Quality, stated that:
It is our view that a 1976 [later amended to 1977] deadline toward achieving best practicable treatment is a reasonable deadline, and the extension we suggest of 2 years is simply

designed to recognize that there can be hardship cases that will exist at the termination of that period of time.
Legis.Hist. at 1175.

27. *See Gemsco, Inc. v. Walling*, 324 U.S. 244, 264–65, 65 S.Ct. 605, 89 L.Ed. 921. *But cf. Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 609, 72 S.Ct. 863, 896, 96 L.Ed. 1153 (1952) (Frankfurter, J., concurring) ("It is one thing to draw an intention of Congress from general language and to say that Congress would have explicitly written what is inferred, where Congress has not addressed itself to a specific situation. It is quite impossible, however, when Congress did specifically address itself to a problem . . . to find secreted in the interstices of legislation the very grant of power which Congress consciously withheld.")

28. *See, e. g., In re I. J. Knight Realty Corp.*, 501 F.2d 62, 67 (3d Cir. 1974); *Mathey v. United States*, 491 F.2d 481, 487 (3d Cir. 1974).

29. 427 U.S. 246, 96 S.Ct. 2518, 49 L.Ed.2d 474 (1976).

nological infeasibility.[30] The Court acknowledged that harsh consequences could ensue under such an interpretation, but stated that this was a risk that Congress had opted to take, and that it was not for the courts to upset that Congressional decision.[31] *Union Electric* appears to indicate that the Supreme Court is willing to construe environmental statutes in a manner that may impose major burdens on polluters, and if the plain language of the applicable legislation so indicates, relief from such hardships must flow from Congress.[32]

The decision in *State Water Control Board v. Train*,[33] reflects an approach similar to that taken in *Union Electric* in the context of a factual situation closely resembling the one in this case.

Section 301(b)(1) of FWPCA[34] requires that publicly-owned sewage treatment plants must comply with certain effluent limitations by July 1, 1977. The Act[35] states that the federal government will provide 75% of all funding required for construction of municipal treatment facilities. For a variety of reasons much of the funding was not made available to local governments. This resulted in many publicly-owned treatment plants being unable to meet the July 1, 1977 deadline. The Virginia State Water Control Board brought suit for a judgment declaring that the affected sewage treatment plants did not have to meet the compliance date. The Board urged that Congress must have intended to link compliance with the deadline to the availability of the federal funds.

Judge Mehrige's opinion expressed sympathy for the predicament in which the municipalities had been placed by the federal government's failure to meet its statutory responsibility. But he ruled that there was no warrant in the legislation for granting an extension of the compliance date.[36] The proper branch of government to extricate the local governments from their difficulties, Judge Mehrige stated, was not the courts, but Congress.

Consequently, on the basis of the legislative history and the adjudicated cases, we hold that the EPA is without authority to grant an extension, in NPDES permits, of the July 1, 1977 date.[37]

### V.

Bethlehem has also asserted that if FWPCA is construed to require compliance by July 1, 1977, the Act, then, deprives it of the due process of law guaranteed by the fifth amendment. It would appear, however, that the federal government's power over interstate commerce is sufficiently broad to encompass this effort to confront the pressing problem of improving the quality of our nation's waters.

We have examined the other contentions raised by Bethlehem and the amicus and find them to be without merit. The petition for review will therefore be dismissed.

---

30. *Id.* at 265, 96 S.Ct. 2518.

31. *Id.* at 269, 96 S.Ct. 2518. *See also id.* at 269, 96 S.Ct. 2518. (Powell, J., concurring).

32. *See also City of Santa Rosa v. EPA*, 534 F.2d 150 (9th Cir. 1976), where the Ninth Circuit upheld EPA gas rationing regulations in spite of the severe economic and social displacement that would be imposed upon certain areas of California. The Court expressed serious concern about the consequences of the regulations, but stated that any ameliorative action would have to come from Congress. *Id.* at 155.

33. 8 E.R.C. 1609 (E.D.Va.1976).

34. 33 U.S.C. § 1311(b)(1) (Supp. III 1973).

35. *Id.* § 1282.

36. 8 E.R.C. at 1612, 1616, 1617.

37. The final report of the National Commission on Water Quality specifically recommends that *the Congress* authorize extensions of the July 1, 1977 deadline in appropriate cases. *Report to the Congress by the National Commission on Water Quality*, March 18, 1976, at 15.