REPUBLIC STEEL CORPORATION,
Petitioner,

v.

Russell E. TRAIN, Administrator, United
States Environmental Protection Agen-
cy, George R. Alexander, Jr., Regional
Administrator, United States Environ-
mental Protection Agency, and Ned E.
Williams, Director, Ohio Environmental
Protection Agency, Respondents.

No. 76–1557.

United States Court of Appeals,
Sixth Circuit.

Argued April 20, 1977.

Decided June 23, 1977.

Eben H. Cockley, Ronald R. Janke, Jones, Day, Reavis & Pogue, Cleveland, Ohio, for petitioner.

Robert V. Zener, Gen. Counsel, E.P.A., Washington, D.C., George R. Alexander, Jr., Region V, Administrator, E.P.A., Chicago, Ill., Ray E. McDevitt, Assoc. Gen. Counsel, Barry L. Malter, Washington, D.C., for respondents.

Before CELEBREZZE and LIVELY, Circuit Judges, and RUBIN,* District Judge.

CELEBREZZE, Circuit Judge.

This case of first impression arises under the 1972 amendments to the Federal Water Pollution Control Act, P.L. 92–500.[1] The question presented is whether failure of the Administrator of the United States Environmental Protection Agency (EPA) to define interim effluent limitations reflecting a given level of pollution control technology, as required by the Act, frees an authorized state agency to issue a discharge permit which sanctions noncompliance with the statutory deadline for achieving that degree of effluent abatement.

The law in the case consists of three interdependent provisions of the Act which are at the crux of the regulatory scheme to control point sources of water pollution.

---

* The Honorable Carl B. Rubin, Judge, United States District Court for the Southern District of Ohio, sitting by designation.

1. 33 U.S.C. § 1251 *et seq.* (Supp. III 1973).

Section 301(b)[2] defines an inflexible schedule for achieving two interim levels of effluent abatement in furtherance of "the national goal that the discharge of pollutants into the navigable waters be eliminated by 1985." Section 101(a)(1). Key to this litigation is the subsection 301(b)(1)(A)(i) requirement of conformity by July 1, 1977 with "effluent limitations for point sources * * * which shall require the application of the best practicable control technology currently available [BPT] as defined by the Administrator pursuant to section [304(b)] of [the Act] * * *." Section 304(b)(1),[3] in turn, obligates the Administrator to publish by October 18, 1973, regulations establishing effluent guidelines reflecting BPT for categories of dischargers including iron and steel manufacturing. See section 306(b)(1)(A).[4]

Pollution control standards promulgated pursuant to sections 301 and 304 are implemented nationally through a decentralized permit granting mechanism defined in section 402[5] as the National Pollutant Discharge Elimination System (NPDES). Subsection 402(a)(1) empowers EPA in the normal course to issue permits which impose industry-wide effluent limitations which it has already defined. In addition, EPA may define these limitations on a case by case basis "prior to the taking of necessary implementing actions relating to all such requirements" (i.e., while rule making is still in progress). *Id.*

■ Subsection 402(b) directs the Administrator to delegate permit granting authority to states which have proposed self-regulatory programs which are operationally compatible with uniform administration of the Act. To ensure that qualifying state environmental agencies apply effluent limitations evenhandedly, subsection 402(d)(2)(B) empowers the Administrator to block issuance of any proposed NPDES permit which he deems to be "outside the guidelines and requirements of [the Act]." *Id.* Whether federal or state in origin, all NPDES permits must ensure compliance with "applicable requirements" of six enumerated provisions of the Act including section 301. In addition, all permits must issue on or before December 31, 1974, pursuant to subsection 402(k).[6]

In July, 1972, Republic Steel Corporation (Republic) applied for a federal permit to continue discharging effluents from its Canton, Ohio steel mill into Nimishillen Creek. The Canton mill is an integrated steel manufacturing operation engaged primarily in the processing of alloy and stainless steel. In March, 1974, Ohio received approval from EPA under section 402(b) to begin issuing NPDES permits, and Republic immediately commenced to negotiate with the Ohio Environmental Protection Agency (Ohio EPA).

In June, 1974, Ohio EPA issued a draft permit[7] for the Canton mill which incorporated *state defined* effluent limitations under state estimates of BPT. The permit provided for a 24 month compliance schedule compatible with the Act's July 1, 1977 interim implementation deadline. At that time EPA had failed to promulgate any section 304(b) effluent limitation guidelines for iron and steel manufacturing.[8] As of

---

**2.** 33 U.S.C. § 1311(b).

**3.** 33 U.S.C. § 1314(b)(1).

**4.** 33 U.S.C. § 1316(b)(1)(A) lists the minimum industry categories of pollution sources for which regulations must be promulgated.

**5.** 33 U.S.C. § 1342.

**6.** This deadline is not expressly mandated by the Act, but may be inferred from the fact that 33 U.S.C. § 1342(k) states that continuation of effluent discharge without a permit after December 31, 1974, will violate the Act unless a permit application is pending and disposition

has been delayed for reasons other than the discharger's own negligence. *See Natural Resources Defense Council, Inc. v. Train*, 166 U.S. App.D.C. 312, 510 F.2d 692, 707 (1975).

**7.** NPDES permit No. D 300*AD.

**8.** Regulations defining BPT effluent limitations for primary operations in carbon steel manufacturing were promulgated in 39 *Fed.Reg.* 24114 (June 28, 1974). However, these regulations were subsequently remanded in their entirety to the Administrator for revision in accordance with the decision in *American Iron and Steel Institute v. EPA*, 526 F.2d 1027 (3rd

the present date no final regulations exist covering alloy and stainless steel operation.[9]

Understandably, in the absence of controlling federal regulations, Republic sought to exploit available state administrative procedures to secure the most favorable permit terms and conditions. Prolonged hearings and negotiations with Ohio EPA resulted in redefinition of the originally proposed effluent limitations. On August 1, 1975, eight months after the last date envisioned by Congress for routine issuance of NPDES permits, final agreement was reached and the implementation period commenced to run. However, Republic continued to assert that full compliance within 24 months was physically impossible.[10] This prompted further adjudication hearings at which Republic presented unchallenged engineering and procurement data which convinced Ohio EPA to modify the permit to allow 42 months for development and installation of antipollution devices. Ohio EPA was aware that this change extended compliance beyond the July 1, 1977, date imposed by section 301(b)(1)(A)(i). However, the state administrator believed that the special circumstances of the case legally justified this deviation.

In January, 1976, Ohio EPA transmitted the final NPDES permit to EPA's Region V office as required by section 402(d)(1). Within 90 days the Director of the Enforcement Division of Region V objected to its issuance, exercising his authority under section 402(d)(2)(B). He did not expressly question the reasonableness of the state's BPT effluent standards or the 42 month implementation schedule. Rather, he concluded that the permit violated section 301 because full compliance would not be achieved until after July 1, 1977. Republic filed a timely petition for judicial review, pursuant to section 509(b)(1)(F),[11] challenging this determination.

We do not question EPA's good faith in attempting to discharge the ambitious and often ambiguous duties imposed upon it by a "poorly drafted and astonishingly imprecise statute." *E. I. du Pont de Nemours & Company v. Train*, 541 F.2d 1018, 1026 (4th Cir. 1976). Many factors, some admittedly beyond EPA's control, have conspired to frustrate its legitimate compliance efforts. In particular, virtually every exercise of the agency's discretion has precipitated protracted litigation challenging the legitimacy of its authority or the substance of its "final" regulations. *See American Petroleum Institute v. Environmental Protection Agency*, 540 F.2d 1023, 1027 (10th Cir. 1976) (thirteen relevant cases cited).

The fact remains, however, that the imperative nature of EPA's rule making responsibilities under the Act has been confirmed through litigation. In 1975, the United States Court of Appeals for the District of Columbia affirmed the authority of a federal district court to compel the agency to adhere to a remedial, court imposed timetable for the publication of guidelines for all point source effluent discharges. *Natural Resources Defense Council, Inc. v. Train*, 166 U.S.App.D.C. 312, 510 F.2d 692 (1975). Unfortunately, judicial intervention did not avert the regrettable situation which confronts us here. The inability of EPA to meet its statutory obligations has distorted the regulatory scheme and imposed additional burdens which must be equitably distributed. This task is a difficult one because of the nature of the available options. Either the affected discharger must be compelled to risk potential enforcement proceedings in spite of an abbreviated compliance schedule, or society must tolerate slippage of an interim pollution abatement deadline.

---

Cir. 1975). As of the date of oral argument in the instant case, no revised regulations had been promulgated.

**9.** "Interim final" guidelines covering alloy and stainless steel operations were published in 41 *Fed.Reg.* 12990 (March 29, 1976).

**10.** Had Republic's permit been issued before the statutory deadline mandated by 33 U.S.C. § 1342(k), the company would have had 30 months to achieve BPT effluent levels.

**11.** 33 U.S.C. § 1369(b)(1)(F).

■ Republic contends that the language of section 301(b)(1)(A)(i) expressly conditions adherence to the July 1, 1977, deadline upon definition *by the Administrator* of BPT effluent limitations and guidelines *pursuant to section 304(b) of the Act.* Therefore, the Administrator's failure to satisfy this condition precedent by publishing final regulations for alloy and stainless steel manufacturing excuses Republic's noncompliance with the July 1 date. We reluctantly agree. The import of the section is unequivocal: federal regulations must exist before dischargers can be compelled to honor dates for implementing them. *See United States v. GAF Corporation,* 389 F.Supp. 1379, 1386 (S.D.Tex.1975). The presence within the Act of successive deadlines for promulgation of standards, issuance of permits, and conformance with effluent limitations bespeaks a rational implementation strategy anticipating a discrete sequence of events:

> The Act's text and its legislative history make clear that as a general matter the section 304(b)(1) guidelines and the section 301(b)(1) limitations were to be developed prior to the issuance of permits. Sections 402(a) and 402(b) require that permits issued by the Administrator and by the states assure compliance with the effluent limitations of section 301. The Senate Report confirms the interdependence of the three provisions. That report states that "[s]ubsection (b) of this section [304] requires the Administrator, within one year after enactment, to publish guidelines for setting effluent limitations reflecting the mandate of section 301, which will be imposed as conditions of permits issued under section 402." Another portion of the Senate Report indicates that at least 30 months lead time is required to afford industries an opportunity to complete construction and modifications necessary to comply with

the phase one effluent limitation deadline. Under the final version of the Act, effluent limitations and permits would be required by December 31, 1974, in order to provide polluters 30 months to comply with the July 1, 1977, deadline.

*Natural Resources Defense Council, Inc. v. Train,* 166 U.S.App.D.C. 312, 510 F.2d 692, 707–708 (1975) (footnotes omitted).

■ The crucial role of federal rule making in achieving meaningful pollution control on a national scale is revealed by the Third Circuit's analysis in *American Iron and Steel Institute v. EPA:*

> [W]e reconcile sections 301 and 304 in the following manner: the section 301 limitations represent both the base level or minimum degree of effluent *control* permissible and the ceiling (or maximum amount of effluent discharge) permissible nationwide within a given category, and the section 304 guidelines are intended to provide precise guidance to the permit-issuing authorities in establishing a permissible level of discharge that is *more stringent than the ceiling.*

526 F.2d 1027, 1045 (3rd Cir. 1975). (emphasis added). If no federal standards exist, *any* state limitations on discharge, no matter how insignificant, become more stringent than nonexistent ceilings imposed by the Act. *See* section 301(b)(1)(C). Surely Congress did not intend for the Act to be construed to foster token, *ad hoc,* clean up efforts which would inevitably defeat achievement of the goal of zero pollution by 1985.[12]

EPA answers Republic's argument by exhorting us to accept the "plain meaning" of section 301(b)(1)(A). The agency contends that the language of the section admits to no other interpretation than that July 1, 1977 is to be a "uniform deadline on all industrial dischargers, * * * plain, un-

---

12. The Director of Ohio EPA, a respondent in the case whose position is aligned with that of Republic, argues that he issued Republic's NPDES permit under the authority of 33 U.S.C. § 1311(b)(1)(C) which allows states to impose more stringent limitations than those applicable under the Act. If we follow this strained rationale, we would have to approve any state permit which authorized dischargers to maintain current effluent levels because *any* standard is more stringent than a nonexistent federal ceiling. This we refuse to do because it would be inimical to achieving meaningful pollution abatement on a national scale.

equivocal and mandatory." Unfortunately EPA's argument is persuasive only if we accept an expurgated version of the section which omits reference to the duty owed by the Administrator to publish regulations by a fixed date.

EPA correctly points out that the Act is devoid of language countenancing exceptions to the July 1, 1977, deadline under any condition. The Act's legislative history is replete with statements attesting to the inflexible nature of the administrative timetable.[13] In addition, Congress rejected a provision in the House version of the measure which would have allowed dischargers a discretionary extension of time in the face of impending noncompliance due to physical or legal impossibility.[14] Nevertheless, nothing cited to us by EPA suggests that Congress anticipated the "Catch 22" situation inherent in the facts of this case. The language of the Act and its legislative history make clear that Congress expected EPA to define the rules before subjecting dischargers to potential civil and criminal penalties. *Natural Resources Defense Council, Inc. v. Train, supra.*

EPA attempts to bolster its position by emphasizing its authority under section 402(a)(1), in advance of formally promulgated regulations, to issue and enforce NPDES permits imposing "such conditions as the Administrator determines are necessary to carry out the provisions of the Act." *Id.* From this, it would have us conclude that the duty of the discharger to achieve BPT by July 1, 1977, must be independent of EPA's obligation to promulgate the necessary guidelines by October 18, 1973. EPA cites *Bethlehem Steel Corporation v. Train,* 544 F.2d 657 (3rd Cir. 1976), and *United States v. Cutter Laboratories, Inc.,* 413 F.Supp. 1295 (E.D.Tenn.1976), in support of this position.[15]

A careful reading of both opinions confirms that EPA's reliance upon them is misplaced. The Third Circuit correctly categorizes EPA's authority under section 402(a)(1) to issue NPDES permits on a case by case basis as a *temporary* expedient to ensure immediate progress during the year of rule making contemplated by section 402(b):

> As a result [of the nonexistence of sections 304 and 301 guidelines and limitations for iron and steel manufacturing as of the date of the opinion], permits have been issued to iron and steel manufacturers under a clause of section 402(a)(1) that empowers the EPA to grant permits, *on an interim basis,* before formal guidelines are promulgated.

*Bethlehem Steel Corporation v. Train,* 544 F.2d at 659 (emphasis added). In the *Bethlehem Steel* case EPA granted the permit on December 31, 1974, the last day mandated by Congress for routine issuance of NPDES permits. Therefore, Bethlehem Steel enjoyed a 30 month compliance schedule, the minimum period possible under the statutory scheme assuming no administrative slippage. In contrast, Republic's permit was issued by a state agency eight months after expiration of the permit granting deadline, affording Republic only 24 months for compliance. This factual difference was not overlooked by the Third Circuit which carefully excludes Republic's situation from the purview of its holding in the *Bethlehem Steel* case.[16]

---

**13.** For a comprehensive review of this legislative history, see *Bethlehem Steel Corporation v. Train,* 544 F.2d 657, 661–662 (3rd Cir. 1976).

**14.** *See A Legislative History of the Water Pollution Control Act Amendments of 1972,* 93rd Cong. 965 (Jan. 1973). (proposed section 301(b)(3).)

**15.** EPA also draws our attention to *State Water Control Board v. Train,* 424 F.Supp. 146, 8 E.R.C. 1609 (E.D.Va., 1976), which upheld the inflexibility of a different section 301 deadline where noncompliance was due to the failure of

Congress to appropriate sufficient money for public works (in this case, the construction of municipal sewage treatment plants). This case is readily distinguished from the present situation where noncompliance is linked to dereliction by EPA of duties imposed by the Act itself as a condition precedent to compliance.

**16.** *See* 544 F.2d at 660 n. 20. Republic appeared as *amicus curiae* in that case on behalf of Bethlehem Steel. *United States Steel Corporation v. Train,* 556 F.2d 822 (7th Cir. 1977), a case in which EPA issued the NPDES permit in

■ We read the *Bethlehem Steel* and *Cutter Laboratory* decisions as standing for the limited proposition that a July 1, 1977, deadline, written into an NPDES permit *issued by EPA on or before December 31, 1974*, is enforceable despite the absence of BPT federal guidelines. Although we may share this view, we find no persuasive authority for extending its application to permits issued by EPA after 1974.[17] In addition, we are convinced that the Act expressly forecloses this result when the permit issuing authority is a state agency. Section 402(b)(1)(A) empowers states to issue NPDES permits which "apply, and insure compliance with, any applicable requirements of sections 301, * * * of [the Act]." *Id.* Our holding that section 301(b)(1)(A)(i) is made unenforceable by the Administrator's failure to promulgate necessary regulations is tantamount to a finding that the July 1, 1977, deadline is no longer an "applicable requirement" of the Act. Therefore, in this case, Ohio EPA was not bound to apply it and EPA was without authority to object to the proposed permit on this ground.[18]

■ EPA's final contention is that it complied with the rule making requirements of section 304(b) by implicitly ratifying the effluent limitations defined by Ohio EPA. EPA ignores the actual language of section 301(b)(1)(A)(i) which demands that BPT guidelines be promulgated pursuant to the procedure set forth in section 304(b). Ohio EPA did not follow that procedure for the obvious reason that section 304(b) is exclusively addressed to the Administrator of EPA. We reject the notion that state action can be federalized *sub silentio* by the mere acquiescence of an administrative agency in the absence of clear statutory provisions to that effect.

Republic urges us to remand the case to EPA with directions that the agency unconditionally approve immediate issuance of Republic's NPDES permit in its original form. However, the record suggests a more appropriate remedy. If we assume that the Administrator satisfactorily performed all the tasks incumbent upon him under sections 301 and 304, Republic could not have received its permit any earlier than September 1, 1974.[19] This would have afforded no more than 34 months to achieve final BPT effluent limitations. The actual permit provides 42 months, eight more than Republic would have been entitled to had there been no distortion of the Act's timetable. Our disposition of this case is intended to relieve the discharger of the unfair consequences flowing from EPA's administrative shortcomings. It is not intended to bestow special benefits not enjoyed by other permittees.

■ EPA is not foreclosed from objecting to Republic's permit on grounds other than the termination date of its compliance schedule. Under the special circumstances of this case, we believe that EPA must be granted a second opportunity to scrutinize the balance of the permit for consistency with the Act.[20] Perhaps the inherent reasonableness of the proposed 42 month period is amenable to administrative review under existing regulations or sections other

---

October, 1974, while federal BPT standards existed for iron and carbon steel manufacturing, is distinguishable from our decision here on the same ground.

**17.** The difficulty is dramatized by a hypothetical case in which EPA issues an NPDES permit in 1977 requiring compliance with the July 1, 1977 completion date. Under such circumstances compliance may well be foreclosed by constitutional objections. *See United States Steel Corporation v. Train*, 556 F.2d 822 at 854 (7th Cir. 1977).

**18.** We expressly exclude from our holding situations in which state agencies may have issued NPDES permits in the absence of federal guidelines prior to December 31, 1974.

**19.** This date approximately reflects the date upon which Republic's permit was first issued by Ohio EPA (prior to extensive renegotiations and modification of terms) plus the maximum period reserved for the filing of objections by EPA.

**20.** The obviousness of the permit's putative section 301 violation may have prompted EPA to bypass an exhaustive review of its other substantive provisions.

than 301. That is for EPA to determine in the first instance.

To guard against the possibility that situations such as this will prompt state agencies to propose extravagant compliance schedules, we remand the case to EPA with directions that the agency acquiesce to issuance by Ohio EPA of Republic's NPDES permit unless, within 30 days, it specifies persuasive new grounds for objection under section 402(d)(2)(B).

Remanded.