[No. 44957. En Banc. November 22, 1978.]

ITT RAYONIER INCORPORATED, *Respondent,* v. THE
DEPARTMENT OF ECOLOGY, *Appellant.*

*Slade Gorton, Attorney General, Charles B. Roe, Jr., Senior Assistant,* and *Charles W. Lean, Assistant,* for appellant.

*Thomas H. Truitt, Wald, Harkrader & Ross, John M. Cary,* and *Perkins, Coie, Stone, Olsen & Williams* (*Leslie S. Bretz, Steven M. Gottlieb, Burroughs B. Anderson, Roger H. Watts,* and *David R. Berz,* of counsel), for respondent.

UTTER, J.—The Department of Ecology (DOE) appeals from the Superior Court's reversal of the decision of the Pollution Control Hearings Board (PCHB) refusing to stay ITT Rayonier's schedule of compliance with the Federal Water Pollution Control Act (FWPCA), as contained in ITT's National Pollutant Discharge Elimination System (NPDES) permit. We hold that ITT is entitled to a stay of the compliance schedule contained in its permit, and affirm the Superior Court.

ITT operates a pulp mill in Port Angeles. Since 1970, DOE and its predecessor have overseen the discharge of pollutants by the mill. Under permits secured in 1970, ITT was required to reduce its discharges significantly. ITT spent over 35 million dollars building the required pollution

control equipment and, with this equipment, met the permissible limits specified in the terms of the state–issued permits. ITT's agreement to undertake the requirements of the state permit also satisfied the Environmental Protection Agency (EPA) objections to ITT's discharges, and forestalled an action against ITT by EPA based upon 1899 federal legislation. ITT remains in compliance with the discharge limits agreed to by ITT, DOE's predecessor, and EPA.

New federal legislation, the FWPCA, was enacted in 1972. States were allowed to administer the NPDES permit process established under that legislation. On August 30, 1974, DOE issued a NPDES permit to ITT, covering its Port Angeles mill. The permit included a section—condition S3—specifying the maximum permissible daily average discharge of effluents into the Straits of Juan de Fuca. Footnote f to that section reads:

> The biochemical oxygen demand, suspended solids, and pH limitations will be modified to be consistent with the applicable final effluent guidelines when promulgated by the EPA in the *Federal Register,* or as thereafter modified by final action consequent upon any appeal from such guidelines.

Footnote f as part of condition S3 was the product of somewhat extended negotiation between ITT and DOE. DOE proposed use of standards from the older federal legislation unrelated to the FWPCA. ITT objected to any standards other than those promulgated specifically for the FWPCA, and indicated that it would prosecute a state appeal if other standards were used. The superior court judge found in an unchallenged finding of fact that both parties were concerned about problems inherent in a state appeal. The parties, seeking to avoid a state appeal, agreed upon footnote f. ITT agreed, in effect, not to conduct a state appeal on the guidelines themselves if EPA guidelines were incorporated into the permit under the conditions specified in footnote f.

The next section of the permit contains condition S4, which specifies the schedule which ITT is to follow in complying with the standards set out in condition S3. Final plans for installation of new, additional pollution control equipment were to be submitted and approved by October 1975, construction was to begin by July 1976, and actual operation in compliance with S3 standards was to occur by July 1, 1977. When this permit was issued in 1974, it was assumed by all parties that the federal EPA would establish the guidelines written into condition S3 by October 1974, as EPA was under court order to do so after failing to meet an earlier deadline established by statute. After failing to meet several other deadlines, EPA finally promulgated final guidelines in January 1977. These guidelines are currently being appealed by ITT in the federal Court of Appeals, District of Columbia Circuit.

ITT submitted plans for its pollution control facilities in September 1975 in accordance with the compliance schedule of condition S4. DOE refused to grant approval to these plans, citing their lack of finality.

DOE issued a compliance order to ITT on December 31, 1975, requiring ITT to submit a final plan. ITT appealed this order to PCHB. ITT also applied to DOE for a stay in the order requiring a final plan, a stay of the compliance schedule, and a modification of the compliance schedule to allow ITT to appeal the EPA guidelines in federal court. Each of these requests was denied, and ITT appealed to PCHB.

The PCHB upheld DOE's refusal to stay or modify the compliance schedule. Upon appeal the superior court judge held that the PCHB's decision was clearly erroneous, and that ITT was entitled to a stay in the compliance schedule until the guidelines were finalized and ITT's federal appeal was completed.

■■ The decision of the PCHB ordering compliance prior to the finality of standards is reviewable under the standards set out in RCW 34.04.130(6). The trial court found that the action of the PCHB was clearly erroneous,

meaning that, despite some support in the record for the decision reached, the reviewing court is left with the firm and definite conviction that a mistake has been committed. *Norway Hill Preservation & Protection Ass'n v. King County Council,* 87 Wn.2d 267, 552 P.2d 674 (1976). This court does not review the decision of the trial court under these circumstances; instead, it is to apply the standards of RCW 34.04.130(6) directly to the administrative decision. *Norway Hill Preservation & Protection Ass'n v. King County Council, supra.* Thus, this court is to make an independent assessment of the agency's action under the statutory review standards.

The primary question which we must address is whether the final standards as established by condition S3 and the schedule of compliance set forth in condition S4 are separate and independent or related and interdependent. DOE asserts the unrelatedness of the two conditions, while ITT maintains that they are necessarily interrelated. Thus, DOE asserts that the compliance schedule may be enforced in the absence of final standards, while ITT urges that orders of compliance are improper until the standards which ITT must meet are finalized. Resolution of this disagreement must be sought in the permit terms itself and the purposes for which condition S3, including footnote f, and condition S4 were included in the permit. The PCHB found that the permit was ambiguous on this point and proceeded to examine the intent of DOE in issuing the permit.

We agree that the permit itself is ambiguous. However, it was error here for the PCHB to look only to DOE's intent to resolve this ambiguity. Although the general rule may be that construction of administrative orders depends only upon the intent or purpose of the issuing agency, *see Airport Coach Serv., Inc. v. Fort Worth,* 518 S.W.2d 566 (Tex. Civ. App. 1974); *Reddi–Wip Co. v. Hardin,* 315 F. Supp. 1117 (E.D. Pa. 1970), under the circumstances here that rule does not apply. Because the portion of the permit at issue here—footnote f—was the product of negotiation

and agreement between the parties, the intent of both parties, and not just the agency, is relevant. The footnote provision is in the nature of a consent decree or a negotiated settlement, and contract principles of construction are properly applied. *United States v. ITT Continental Baking Co.*, 420 U.S. 223, 43 L. Ed. 2d 148, 95 S. Ct. 926 (1975); *United States v. Armour & Co.*, 402 U.S. 673, 29 L. Ed. 2d 256, 91 S. Ct. 1752 (1971). This is in accord with a recent federal district court decision involving the precise permit provision under discussion here. *United States v. ITT Rayonier, Inc.*, 10 E.R.C. 1869 (W.D. Wash. 1977).

In this case, determining that the intent of both parties is relevant is far easier than divining that intent. The key event in the sequence leading to this case was unanticipated by either party—EPA's default in the issuance of final guidelines, including failure to meet (1) the statutory command to promulgate guidelines in 1973, and (2) several court orders to promulgate them, the first of which ordered issuance by 1974. Only now, in the wake of that default, does the relationship between standards established in S3 and the compliance schedules set forth in S4 become vitally important. Because this issue had little apparent importance at the time the permit was issued, the parties apparently failed to address it specifically in their negotiations and there is therefore little evidence of intent on this issue.

Ironically, the most useful of the few clues to the intent and understanding of the parties are past communications by each party which could be construed to suggest understandings contrary to the positions they now assert. Memoranda written by DOE officials appear to recognize that the purpose of footnote f was to prevent ITT from being forced to meet standards other than the final ones promulgated by EPA. Two memoranda written by DOE's chief negotiator in this matter are relevant. The first, dated August 13, 1974, which reported on meetings among representatives of EPA, DOE, and ITT, contains the following paragraph:

I also would recommend that we accept the requested modification of footnote f on the bottom of page 5 to add

the suggested words ". . . or if thereafter modified by final action consequent upon any appeals from such guidelines." If this is explained this would allow ITT to incorporate any limits that may come out of a court challenge of EPA guidelines, otherwise the mill would be committed to the levels that EPA provocated [*sic*] the way the footnote finally stands.

The second memorandum, dated August 22, 1974, includes:

Footnote f has been expanded to include the wording, "or as thereafter modified by final action consequent upon any appeal from such guidelines." This request came from the ITT legal people, who did not want to be locked into the promulgated guideline numbers if a court action resulted in less stringent guideline numbers.

Quite obviously, DOE recognized that the footnote was designed to assure that the final EPA standards following promulgation and any appeal would be the ones to govern ITT's permit. However, DOE representatives disclaim ever even considering the interdependence of the standards and compliance schedule; the chief negotiator testified that the possibility of conflict between the standards and the compliance schedule never occurred to him.

Conversely, the strongest evidence in support of DOE's position is contained in a letter from ITT's attorney to DOE. Portions of it read as follows:

We are of course prepared to conform to permits based on properly developed guidelines. However, in view of the controversial approach adopted by EPA for Phase I, we would feel it necessary to appeal the BOD and solids levels in the permit as now proposed if publication by EPA in the Federal Register is to be the final determinant.

Perhaps the Department would consider modifying the proposed paragraph to read as follows:

"The BOD and SS limits will be modified to be consistent with the applicable final effluent guidelines when promulgated by EPA in the Federal Register, or as thereafter modified by final action consequent upon any appeal from such guidelines."

It seems to me that this preserves the position of all parties and allows final guidelines, consistent with the statute, to control.

. . .

Since the numbers in the permit now, or as amended following publication in the Federal Register, would govern until amended further, there should be no concern on the part of the Department or EPA that extended litigation on the guidelines might prevent compliance. If you have problems with our suggestions I would be glad to come out to discuss it with the Department or EPA.

ITT has explained the final paragraph above in a number of ways. First, it urges that it was intended to assure DOE that dilatory tactics would not be used by ITT, and that the company would refrain from frivolous appeals and appeals in state court on the issue of the propriety of the selected standards. Second, it asserts that the paragraph was also to affirm that if litigation resulted in the total failure of the EPA guidelines, the interim standards in the permit would be allowed to operate as actual, enforceable standards. These explanations, while they may contain some plausibility, are not compelling. However, a third explanation is. ITT reminds us that this letter—written June 14, 1974, before either of the DOE memos discussed above—was written in the context of expectations that EPA's guidelines would be forthcoming almost immediately. The letter explained that the end results of modifications brought about by the process of finalizing those guidelines would be incorporated as the final standards. Given the expectation that the guidelines would be promulgated within a very short time with any appeal required to begin immediately thereafter, no problem with the compliance schedule was foreseen.

█ We are satisfied that ITT was no more clairvoyant than DOE with respect to EPA's failure to promulgate guidelines in a timely fashion. If EPA had promulgated regulations when expected, there would not have been any reason for the relationship between the standards and the compliance schedule to become the important issue it now

is. Because the parties did not consider the possibility of EPA's delay, it is essentially fruitless to look for evidence of the parties' specific intent with respect to the standards and schedule. Instead, it is more profitable to examine the purpose of footnote f and its logical application in these unforeseen circumstances.

The fundamental practical function of condition S3 was to provide ITT with identifiable and specific standards at which to aim its statutorily required pollution control efforts. Footnote f established that the final effective standards were to be those emerging from EPA's guidelines and appeals thereto. The existence of firm, final standards is logically prerequisite to an effective planning effort to meet those standards.

It is estimated that ITT will expend between 22 and 28 million dollars in constructing its additional pollution control equipment under this permit. Although the enormous magnitude of this expenditure is not legally significant, it does underscore the absurdity, in light of the purpose behind condition S3 and footnote f, of ordering expenditure of those funds prior to a determination of precisely what that expenditure will be required to accomplish. The importance of final standards prior to that expenditure establishes the natural interdependence of the standards of S3 and the compliance schedule of S4. The functional importance of, and essential purpose behind, footnote f was frustrated by the decision of the PCHB and we are convinced that decision was clearly erroneous.

Our conclusion is contrary to that reached in the federal district court in *United States v. ITT Rayonier, Inc.*, 10 E.R.C. 1869 (W.D. Wash. 1977), in which the judge found no ambiguity in the footnote, and held that the standards to be achieved and the schedule of compliance to meet those standards are unrelated because footnote f fails to mention the compliance schedule specifically. This is a different holding from that of the PCHB in this case, which recognized as we do the ambiguity of footnote f, but

applied the wrong principles to resolution of that ambiguity. The result in this case is based upon the need, as we have previously stated, for ITT to know what the final standards are before it commits millions of dollars to plant design and construction to meet them. This is compelling and suggests a natural relationship obviating the necessity of specific reference in footnote f to the compliance schedule.

DOE contends that the FWPCA mandates universal compliance by July 1, 1977, and that it is illegal or ultra vires to defer compliance beyond that date. The answer to this contention is twofold.

First, DOE has seriously compromised its position by issuing other permits which did not require compliance by that date. DOE has attempted to show factual differences between the circumstances surrounding those permits and this one. The other permits are distinguished on the ground of the time of their issuance and on the basis of new technology explored by the permittees. However, these factors are not shown to have any legal significance: DOE fails to demonstrate that there is any factor which renders these extensions lawful and proper under ITT's interpretation of the FWPCA while an extension to ITT is illegal and ultra vires.

Second, the July 1, 1977, date cannot be applied in a vacuum. Given our conclusion that the standards and compliance schedule are interdependent, only the most dogmatically tunnel–visioned approach can ignore EPA's 3 1/2–year default on its statutorily declared duty with respect to promulgation of guidelines. The very same statutory section which establishes the July 1, 1977, deadline specifically refers to the duty of EPA to establish guidelines and define best practicable technology by October 1973. See 33 U.S.C. § 1311(b)(1)(A); § 1314(b). It is clearly inappropriate to charge ITT with the prejudicial effects of EPA's failures. The federal Sixth Circuit Court of Appeals recognized the impropriety of saddling private industrial dischargers with the consequences of governmental delay in

*Republic Steel Corp. v. Train,* 557 F.2d 91, 95–96 (6th Cir. 1977),[1] when it declared:

EPA answers Republic's argument by exhorting us to accept the "plain meaning" of [the section of the FWPCA establishing the July 1, 1977 deadline]. The agency contends that the language of the section admits to no other interpretation than that July 1, 1977 is to be a "uniform deadline on all industrial dischargers, * * * plain, unequivocal and mandatory." Unfortunately EPA's argument is persuasive only if we accept an expurgated version of the section which omits reference to the duty owed by the Administrator to publish regulations by a fixed date.

EPA correctly points out that the Act is devoid of language countenancing exceptions to the July 1, 1977, deadline under any condition. The Act's legislative history is replete with statements attesting to the inflexible nature of the administrative timetable. In addition, Congress rejected a provision in the House version of the measure which would have allowed dischargers a discretionary extension of time in the face of impending noncompliance due to physical or legal impossibility. Nevertheless, nothing cited to us by EPA suggests that Congress anticipated the "Catch 22" situation inherent in the facts of this case. The language of the Act and its legislative history make clear that Congress expected EPA to define the rules before subjecting dischargers to potential civil and criminal penalties.

---

[1] The United States Supreme Court vacated the original Sixth Circuit decision in *Republic Steel Corp. v. Train, supra,* and remanded for further consideration in light of the Clean Water Act of 1977. *Costle v. Republic Steel Corp.,* 434 U.S. 1030, 54 L. Ed. 2d 778, 98 S. Ct. 761 (1978). Upon remand, the crucial statute considered by the Sixth Circuit was a new section added in 1977, 33 U.S.C. § 1319(a)(5)(B), which provides that the Administrator of EPA can, in his discretion, extend the deadline for compliance, but not later than April 1, 1979. *Republic Steel Corp. v. Costle,* 581 F.2d 1228 (6th Cir. 1978). Application for such an extension would have been meaningless for ITT in this case. Because of the lengthy lead time required in construction of the massive pollution control facilities involved, ITT arguably could not have achieved compliance by April 1, 1979, even if it had commenced construction on December 27, 1977, the date the 1977 act was adopted. To limit ITT's remedies to seeking such an extension would be effectively to deny it any remedy at all.

(Footnotes omitted.) Although the opinion was limited to permits issued after December 31, 1974, the rationale for the decision was the necessary dependence of post–1974 permits upon EPA final guidelines, a factor present here as well despite issuance prior to January 1, 1975. ITT's permit is apparently unusual for a permit issued in 1974 in its reliance upon EPA guidelines. Most such permits contain standards gleaned from older legislation. These standards were not used here as a result of specific agreement between ITT and DOE in their negotiations to avoid a state court appeal on the standards selected.

Our conclusion here is also in harmony with a Ninth Circuit opinion delivered earlier this year. In *Washington v. EPA*, 573 F.2d 583 (9th Cir. 1978), the Court of Appeals found that the failure of EPA to timely prepare final guidelines left the regional administrator of the EPA without power to veto state–issued permits for failure to meet the administrator's idea of what the guidelines should be. Further, the court held that the administrator's action trampled upon the discharger's right to participate in the guideline development process, even though the permit at issue contained no provision comparable to footnote f.

> We are clear, upon a review of the statutory scheme, that Congress did not intend to deprive permit applicants of the significant procedural opportunity to contribute to the formulation of administrative guidelines through participation in public rule making proceedings by permitting the Administrator to object to a proposed state–issued NPDES permit in the absence of duly published guideline regulations and on the basis of what is in effect an *ad hoc* determination of what constitutes [best practicable technology] for an individual point source.

*Washington v. EPA, supra* at 590–91. That observation is relevant here as a result of our conclusion that footnote f gives ITT appeal rights on the guidelines.

The opinion in *Washington v. EPA, supra,* is consistent with the import of the *Republic Steel* case and our decision here in reflecting the belief that private dischargers cannot

properly be forced to bear the significant adverse consequences of delays and shortcomings chargeable solely to the government.

In summary, we hold that the compliance schedule cannot be carried out in the absence of final standards applicable to ITT's discharges. Footnote f gives ITT the irrevocable right to complete appeal of EPA guidelines before the standards in ITT's permit are final. EPA's failure to meet the timetables for guideline issuance necessarily excuses ITT from the compliance schedule dependent upon the guidelines. The compliance schedule is deferred until the guidelines are final after appeal. DOE is empowered to reinstate the compliance schedule at such time as it deems proper after completion of appeal, subject to at least a 3–month allowance from the time the guidelines are judicially finalized before final plans for construction of ITT's new pollution control equipment can be declared due.

The Superior Court judgment is affirmed.

WRIGHT, C.J., and STAFFORD, BRACHTENBACH, HOROWITZ, and HICKS, JJ., concur.

DOLLIVER, J. (dissenting)—Following the lead of the United States District Court in *United States v. ITT Rayonier, Inc.*, 10 E.R.C. 1869 (W.D. Wash. 1977), per McGovern, J., the majority characterizes the provisions in footnote f as "in the nature of a consent decree or a negotiated settlement." In *United States v. Armour & Co.*, 402 U.S. 673, 681–82, 29 L. Ed. 2d 256, 91 S. Ct. 1752 (1971), in discussing the scope of such a provision, the Supreme Court stated:

> Consent decrees are entered into by parties to a case after careful negotiation has produced agreement on their precise terms. The parties waive their right to litigate the issues involved in the case and thus save themselves the time, expense, and inevitable risk of litigation. Naturally, the agreement reached normally embodies a compromise; in exchange for the saving of cost and elimination of risk, the parties each give up something they might have won

had they proceeded with the litigation. Thus the *decree* itself cannot be said to have a purpose; rather the *parties* have purposes, generally opposed to each other, and the resultant decree embodies as much of those opposing purposes as the respective parties have the bargaining power and skill to achieve. For these reasons, the scope of a consent decree must be discerned within its four corners, and not by reference to what might satisfy the purposes of one of the parties to it. Because the defendant has, by the decree, waived his right to litigate the issues raised, a right guaranteed to him by the Due Process Clause, the conditions upon which he has given that waiver must be respected, and the instrument must be construed as it is written, and not as it might have been written had the plaintiff established his factual claims and legal theories in litigation.

(Footnote omitted.)

As the district court noted, under *Armour* it is up to the court to interpret footnote f without regard to any claim that there is an issue of fact with respect to the intention of the parties.

The district court correctly analyzed footnote f without regard to the intention of the parties and reached an opposite and I believe more supportable result than does the majority:

It is the opinion of the Court that footnote f affects only the final effluent limitations that must be achieved and not the compliance schedule. By its express terms, footnote f provides only that the "limits will be modified to be consistent with the applicable final effluent guidelines" and not that the compliance schedule will be modified as these guidelines are announced. Additionally, the footnote is to Special Condition S3 which is limited to "Final Effluent Limitations and Monitoring Requirements." A different section. Special Condition S4 controls all questions regarding the compliance schedule. If footnote f affected the schedule of compliance, it would make reference to that section or expressly state that it otherwise alters the deadlines set out there.

This construction of footnote f is consistent with the provisions of the Federal Water Pollution Act. Without reaching the Government's contention that the July 1,

1977 deadline is mandatory, 33 U.S.C. § 1311(b)(1)(A) creates a strong presumption that the deadline would not be modified without a clear agreement to that effect. Moreover, it is unlikely that an NPDES permit would satisfy 33 U.S.C. § 1342 if it had an indefinite and potentially unenforceable compliance schedule, as would happen in this case if the Court accepted the defendant's strained construction of the footnote.

Defendant raises a strong point that the obvious purpose in bargaining for footnote f was that it did not want to have to build costly facilities to meet standards that might be subsequently relaxed or even rejected by federal court action. But as inexcusable as the Government's delay in promulgating standards has been, that purpose does not justify this Court in interpreting the footnote contrary to its express terms.

The EPA's delay in promulgating effluent guidelines does not entitle Defendant to an extension of the July 1, 1977 deadline. *United States Steel Corp. v. U.S.E.P.A.,* Nos. 76–1425 and 76–1616 [10 ERC 1001] (7th Cir., May 13, 1977). *See also, Train v. NRDC,* 421 U.S. 60 [7 ERC 1735] (1975).

The result reached by the majority renders meaningless the standards and the compliance schedule, S4, set forth in the permit. I find inconceivable the proposition that these standards were without purpose. They were established by agreement between the Department of Ecology and ITT Rayonier as the level of permissible discharge which would be in effect prior to the Environmental Protection Agency's (EPA) promulgation. Although there did exist uncertainty as to their relationship to the new EPA standards, this is the bargain that was struck between the parties. In return for the privilege of continued operation, ITT Rayonier agreed to comply with these standards until the new federal standards came forth. Yet the majority does not hesitate to deprive the State of the benefit of its bargain.

I find it difficult to accept that the State and ITT Rayonier intended to postpone indefinitely construction of the pollution control facilities. While the footnote in question, without equivocation, gives ITT Rayonier the right to modification of the state standards so as to coincide with

the federal standards, nothing in the record indicates the parties agreed to an open–ended delay of construction until the finalization of federal standards on appeal. It can be assumed only that the standards set forth in section S3 of the permit were to be complied with. Further, nothing in the schedule of compliance in section S4 indicates that the parties contemplated a delay in construction until such time as the EPA released its final limitations.

To accept the position of the majority turns the entire permit process into an elaborate and meaningless charade. If in fact the parties intended nothing to be done until the question of the federal standards was settled, it seems strange that this was not the end of the matter. Instead, an elaborate 11–page NPDES permit was issued, including the compliance schedule S4. Under these circumstances, it is inconceivable to me that both parties did not expect that the compliance schedule, S4, was to be followed.

Finally, in *Republic Steel Corp. v. Train*, 557 F.2d 91 (6th Cir. 1977), a case cited by the majority, the court expressly excluded from its holding those situations in which state agencies issued NPDES permits in the absence of federal guidelines prior to December 31, 1974. This was the situation in this case.

The majority's conclusion that the Pollution Control Hearings Board was "clearly erroneous" in refusing the stay of compliance requested by ITT Rayonier is unsupportable on this record.

Accordingly, I dissent.

ROSELLINI and HAMILTON, JJ., concur with DOLLIVER, J.

Reconsideration denied March 26, 1979.