**FORD MOTOR COMPANY, Petitioner,**

v.

**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, Respondent,**

and

**State of Michigan, Intervenor.**

**No. 76–1463.**

United States Court of Appeals, Sixth Circuit.

Argued June 21, 1977.

Decided Dec. 6, 1977.

H. Edward Dunkelberger, Jr., Theodore L. Garrett, Covington & Burling, Washington, D.C., for petitioner.

Robert V. Zener, Gen. Counsel, Environmental Protection Agency, Ray E. McDevitt, Alfred Ghiorzi, Pat Mulloy, Dept. of Justice, Washington, D.C., for respondent.

Before WEICK and ENGEL, Circuit Judges, and WEINMAN, Senior District Judge.*

WEICK, Circuit Judge.

The principal question before us is whether the Environmental Protection Agency [EPA] properly vetoed modifications in Ford Motor Company's [Ford] existing National Pollutant Discharge Elimination System [NPDES] permit which were proposed by the Michigan Water Resource Commission [MWRC] pursuant to the Federal Water Pollution Control Act of 1972 [FWPCA] §§ 101, et seq., 33 U.S.C. §§ 1251, et seq. Ford has petitioned for review of EPA's veto of the permit modifications. We hold that the veto of EPA was invalid because it was not based upon any published regulation or guideline or on any express statutory provision.

## I

In order fully to understand the issues, a review of the pertinent provisions of the FWPCA is necessary. Congress declared that the objective of the Act was "to restore and maintain the chemical, physical and biological integrity of the Nation's waters" § 101(a), 33 U.S.C. § 1251(a). One of the national goals of the Act was to eliminate by 1985 "the discharge of pollutants into navigable waters." § 101(a)(1). Furthermore, Congress proclaimed by the Act its policy to have the States participate in the prevention, reduction and elimination of pollution. § 101(b). Congress also stressed the need for public participation "in the development, revision and enforcement of any regulation, standard, effluent limitation, plan or program established by the Administrator or any State" and required the publication of "regulations specifying minimum guidelines for public participation in such processes." § 101(e).

The Supreme Court in *EPA v. State Water Resources Control Bd.*, 426 U.S. 200, 204–05, 96 S.Ct. 2022, 2024–25, 48 L.Ed.2d 578 (1976), noted one of the purposes of the Act:

First, the Amendments are aimed at achieving maximum "effluent limitations" on "point sources," as well as achieving acceptable water quality standards. A point source is "any discernible, confined and discrete conveyance . . . from which pollutants are or may be discharged."[9] An "effluent limitation" in

[9] § 502(14), 33 U.S.C. § 1362(14) (1970 ed., Supp. IV). The terms "pollutant" and "discharge of pollutant" are defined in §§ 502(6), (12), 33 U.S.C. §§ 1362(6), (12) (1970 ed., Supp. IV).

turn is "any restriction established by a State or the Administrator on quantities, rates, and concentrations of chemical, physical, biological, and other constituents which are discharged from point sources . . . including schedules of

* The Hon. Carl A. Weinman, Senior Judge, United States District Court for the Southern District of Ohio, sitting by designation.

compliance." [10] Such direct restrictions

[10] § 502(11), 33 U.S.C. § 1362(11) (1970 ed., Supp. IV). Section 502(17) defines a "schedule of compliance" to be "a schedule of remedial measures including an enforceable sequence of actions or operations leading to compliance with an effluent limitation, other limitation, prohibition, or standard." 33 U.S.C. § 1362(17) (1970 ed., Supp. IV).

on discharges facilitate enforcement by making it unnecessary to work backward from an overpolluted body of water to determine which point sources are responsible and which must be abated. In addition, a discharger's performance is now measured against strict technology-based [11] effluent limitations—specified

[11] Point sources other than publicly owned treatment works must achieve effluent limitations requiring application of the "best practicable control technology currently available" by July 1, 1977, and application of the "best available technology economically achievable" by July 1, 1983. §§ 301(b)(1)(A), (2)(A), 33 U.S.C. §§ 1311(b)(1)(A), (2)(A) (1970 ed., Supp. IV).

levels of treatment—to which it must conform, rather than against limitations derived from water quality standards to which it and other polluters must collectively conform. [12]

[12] Water quality standards are retained as a supplementary basis for effluent limitations, however, so that numerous point sources, despite individual compliance with effluent limitations, may be further regulated to prevent water quality from falling below acceptable levels. See §§ 301(e), 302, 303, 33 U.S.C. §§ 1311(e), 1312, 1313 (1970 ed., Supp. IV).

The EPA Administrator was required after consultation with the appropriate federal and state agencies and other interested persons, to adopt regulations providing guidelines for effluent limitations no later than October 18, 1973 and annually thereafter. § 304(b)(2), 33 U.S.C. § 1314(b)(2). Once these guidelines were provided they were to be followed when NPDES permits were issued and were "to serve as the basis of the administrator's veto of objectionable permits." *CPC Int'l, Inc. v. Train,* 515 F.2d 1032, 1039 (8th Cir. 1975). *Compare E. I. duPont deNemours & Co. v. Train,* 430 U.S. 112, 133, n. 24, 97 S.Ct. 965, 51 L.Ed.2d 204 (1977).

The EPA Administrator also was authorized to promulgate effluent limitations for classes and categories of existing point sources which necessarily serve as a basis for denial of a permit. *See* § 301, 33 U.S.C. § 1311; *E. I. duPont deNemours & Co. v. Train, supra;* and *American Iron and Steel Inst. v. EPA,* 526 F.2d 1027, 1041 (3d Cir. 1975).

The Court in the *duPont* case explained at 130 of 430 U.S., at 976 of 97 S.Ct. the function of the § 304(b) guidelines and at the same time their relation to § 301 regulations:

As we noted earlier, § 304(b) requires EPA to identify the amount of effluent reduction attainable through use of the best practicable or available technology and to "specify factors to be taken into account" in determining the pollution control methods "to be applicable to point sources . . . within such categories or classes." These guidelines are to be issued "[f]or the purpose of adopting or revising effluent limitations under this Act." As we read it, § 304 requires that the guidelines survey the practicable or available pollution control technology for an industry and assess its effectiveness. The guidelines are then to describe the methodology EPA intends to use in the § 301 regulations to determine the effluent limitations for particular plants. [footnote omitted]

Congress also provided a plan for implementing water quality standards, which addressed the problem of concentration of pollutants in particular bodies of water, to meet the purposes and goals of the FWPCA.

Section 303(a), 33 U.S.C. § 1313(a) provides for state-adopted water quality standards including those state standards adopted prior to the FWPCA, which standards meet the requirements of the FWPCA unless otherwise determined by the EPA Administrator. For instance, on September 21, 1973 the State of Michigan, pursuant to the FWPCA, approved new water quality standards which went into effect on December 12, 1973. Michigan Water Quality Standards, Michigan Administrative Code

Part 4; Rule 323.1041, *et seq.* Because EPA took no action on the Michigan standards, they became the federal water quality standards in that state. *See* § 303(c)(3), 33 U.S.C. § 1313(c)(3).

Moreover, the EPA Administrator, after issuing notice and holding a public hearing, has authority to establish more restrictive effluent limitations to "discharges of pollutants from a point source or group of point sources" which (even though the effluent limitations under § 301(b)(2) (best available control technology) are applied to the point sources) would still be interfering "with the attainment or maintenance of that water quality in a specific portion of the navigable waters . . .". § 302(a) and (b), 33 U.S.C. § 1312(a) and (b).

The Supreme Court in the *State Water Resources* case also explained a second purpose of the FWPCA, 426 U.S. at 205, 96 S.Ct. at 2025:

> Second, the Amendments establish the National Pollutant Discharge Elimination System (NPDES) [13] as a means of achiev-
>
> [13] § 402, 33 U.S.C. § 1342 (1970 ed., Supp. IV).
>
> ing and enforcing the effluent limitations. Under NPDES, it is unlawful for any person to discharge a pollutant without obtaining a permit and complying with its terms.[14] An NPDES permit

[14] Section 301(a), 33 U.S.C. § 1311(a) (1970 ed., Supp. IV), makes unlawful "the discharge of any pollutant by any person" except in compliance with numerous provisions of the Amendments, including § 402 which establishes NPDES.

In effect, the NPDES terminates operation of the Refuse Act permit program. §§ 402(a)(4), (5), 402(k), 33 U.S.C. §§ 1342(a)(4), (5), 1342(k) (1970 ed., Supp. IV).

> serves to transform generally applicable effluent limitations and other standards—including those based on water quality—into the obligations (including a timetable for compliance) of the individual discharger, and the Amendments provide for direct administrative and judicial enforcement of permits. §§ 309 and 505, 33 U.S.C. §§ 1319, 1365 (1970 ed., Supp. IV). With few exceptions, for enforce-

ment purposes a discharger in compliance with the terms and conditions of an NPDES permit is deemed to be in compliance with those sections of the Amendments on which the permit conditions are based. § 402(k), 33 U.S.C. § 1342(k) (1970 ed., Supp. IV). In short, the permit defines, and facilitates compliance with and enforcement of, a preponderance of a discharger's obligations under the Amendments.

EPA is empowered by Congress to issue these permits. § 402, 33 U.S.C. § 1342. However, the Act also provides that these permits may be issued by the States. If a State desires to administer the program pursuant to the Congressional policy of State control over water pollution, EPA must first approve the State's permit program. *See* § 402(b). Once the Administrator's approval is given, the State may issue NPDES permits as long as the permits meet the requirements of the FWPCA. Among its duties under the permit program, the State must "provide an opportunity for public hearing before a ruling on each such application [for a permit]" and provide the Administrator with "notice of each application [including a copy thereof] for a permit." § 402(b)(3) and (4). On October 17, 1973 the EPA Administrator approved the permit program of the State of Michigan. 39 F.R. 26061 (July 16, 1974).

In addition to EPA's possible withdrawal of its approval of a State's permit program under § 402(c), EPA also retains a veto power over a State's issuance of an individual permit. Section 402(d)(2)(B) provides:

> No permit shall issue . . . if the Administrator within ninety days of the date of transmittal of the proposed permit by the State objects in writing to the issuance of such permit as being *outside the guidelines and requirements of [the Act].* [Emphasis added]

The aggrieved party has ninety days from the date of denial of the permit under § 402 in which to seek review of the Administrator's action, by petition therefor filed in the appropriate United States Court of Appeals. § 509(B)(1)(F), 33 U.S.C. § 1369(b)(1)(F).

## II

Ford operates a stamping plant in Monroe, Michigan. Each day the plant produces 40,000 steel automobile wheels, 16,000 bumpers and numerous coil springs. The plant discharges into the Raisin River less than one mile above the river's point of entry into Lake Erie, various metals, such as chromium, copper, nickel and zinc.

On June 30, 1971 Ford applied for a NPDES discharge permit for its Monroe plant.[1] On the application form at the place noted for intake sources, Ford indicated that it planned to pump 147 million gallons [MGD] of water per day from Lake Erie, treat 10 MGD for the plant millwater supply, and discharge the excess (137 MGD) into a plant-owned canal, a dilution water canal, which in turn discharges the water into the Raisin River. Later, in November 1973, Ford revised its permit application.

In August, 1974 EPA questioned among other things, Ford's proposed use of the entire Raisin River as a "mixing zone." Under Michigan Water Quality Standards Rule 1043(n) a "mixing zone" is "a region of a water body which receives a wastewater discharge of a different quality than the receiving waters, and within which the water quality standards as prescribed by these rules do not apply." The State of Michigan does not allow use of more than 25% of the stream as a mixing zone "unless it can be demonstrated [to the MWRC] that designation of a greater area or volume of streamflow will allow passage of fish and fishfood organisms so that effects on their immediate and future populations are negligible or not measurable." Rule 1082 of the Michigan Water Quality Standards.

EPA, based on a bioassay conducted by the MWRC in April, 1973, also questioned Ford's ability during the Raisin River's low flow period, to meet the water quality standard concentration limits.

In September, 1974 EPA again questioned the use of the entire width of the Raisin River as a mixing zone and suggested that Ford use only one-half of the river. MWRC soon responded to the EPA suggestion and revised the mixing zone to include "the total flow in the River Raisin from the point of discharge to the Detroit Edison Power Plant intake" (which intake is about 900 feet distant from the Ford discharge). MWRC stated that "[t]he effluent restrictions placed on the Ford Motor Company Monroe Plant discharge are more restrictive than the promulgated guidelines."

On December 20, 1974 the State of Michigan, pursuant to the approval of MWRC, issued Ford the NPDES permit on its Monroe Plant. The permit included the mixing zone as suggested to EPA by MWRC, *supra*. EPA did not veto the permit and it became effective.

On July 11, 1975 MWRC at Ford's suggestion, sent to EPA a proposed modification of Ford's Monroe Plant permit. Among other things, MWRC proposed use of flow augmentation for Ford to meet water quality standards. Ford, in its brief to this Court, stated:

The term "flow augmentation" as described in the proposed permit refers to the mixing of the treated effluent from the plant with other waters (from a mixing canal on the plant property [which water was obtained from Lake Erie]) in order to reduce the concentration of pollutants to levels specified in the permit and to assure compliance with the concentration limits in the water quality standard for the river into which the effluent is ultimately discharged.

The proposed modification was succinctly stated by Jeffrey G. Miller, EPA Deputy Assistant Administrator for Water Enforcement:

The relevant facts are that the best practicable technology will achieve necessary reduction in pounds of pollutants discharged but that the resulting concentration in the volume of process effluent is still greater than concentration limits

1. Originally Ford applied for the permit under the Rivers and Harbors Act of 1899, 33 U.S.C. § 407. When the FWPCA was passed, its permit application was deemed a request under the new Act. § 402(a)(5), 33 U.S.C. § 1342(a)(5).

specified in the Michigan Water Quality Standards. The State proposes to allow flow augmentation (dilution) to meet the water quality standard concentration limitations. Monitoring for compliance with the BPT limitations is to be done prior to dilution. Monitoring for compliance with the water quality standards concentration limitations is to be done at the downstream edge of the mixing zone. The mixing zone for purposes of evaluating compliance with the State's water quality standards is defined as the total flow in the Raisin River from the point of discharge to the Detroit Edison Power Plant intake, a distance of approximately 900 feet. The State concedes that a mixing zone generally should not include an entire river but claims that Michigan biologists are confident that fish passage will be assured if the concentration limits are not exceeded.

Initially, in August, 1975 in a telephone conversation between Harry J. Clemens of EPA's Region V Permit Branch and Carl Schafer of EPA's Washington headquarters, EPA believed that use of flow augmentation in the mixing zone and receiving water was proper so long as the best practicable control technology [BPT] currently available was being applied and that the flow augmentation was not being used to "dilute to meet [the best available technology economically achievable]". In fact, in the next three communications between EPA and MWRC, no objections were raised with respect to the use of flow augmentation.

On October 1, 1975 however, in a letter from Dale S. Bryson, the Region V EPA Deputy Director Enforcement Division, to Roy Schrameck, MWRC's Division Permit Coordinator, EPA again questioned whether fish passage on the river was possible due to the large size of the mixing zone,

and requested studies from MWRC pursuant to Rule 1082 of the Michigan Water Quality Standards to demonstrate fish passage in the river. More importantly, EPA expressed displeasure with the use of flow augmentation to meet the water quality standards. Mr. Bryson said:

The plan to allow the company to treat their metal plating wastes to the BPT level and then dilute with cooling water and possibly flow augmentation to meet water quality standards is in conflict with the intent of the Federal 1972 Amendments and EPA Policy. Dilution should not be utilized unless additional treatment is unavailable or economically unreasonable. Treatment at the BPT level is not usually the point at which additional treatment is considered economically unreasonable. Therefore, please submit any documentation which purports to demonstrate that additional treatment is unreasonable and that flow augmentation is the only available approach. This should be done on a process by process and parameter by parameter basis and should also include the anticipated effect this additional pumpage would have on entrainment and impingement impacts on the fish population in the surrounding nursery and spawning areas and migratory routes.

Despite the above letter, on October 7, 1975 Robert J. Courchaine, Chief Engineer of MWRC formally submitted to EPA (Bryson) the proposed modifications on Ford's Monroe Plant permit which included a control of heavy metal concentration that would assure uninterrupted fish passage "accomplished on a continuing basis by low-flow augmentation, an acceptable water quality management tool." Mr. Courchaine emphasized that the proposed permit modifications required filtration as an additional BPT treatment step.[2]

2. The proposed permit modification as to discharge limitations beginning on July 1, 1977 states:

These limitations are based on water quality considerations. Flow augmentation, or dilution, can be used to meet these limitations if, and only if, the following treatment facilities,

when operated to produce an optimum effluent, are not capable of achieving such limitations:
—destruction of cyanide by oxidation
—reduction of hexavalent chromium to the trivalent form
—neutralization

On October 17, 1975 Paul Zugger, Assistant Regional Engineer of the Bureau of Water Management of MWRC wrote Harry Clemens of EPA, informing him that the chlorine limit in Ford's permit would be revised to facilitate fish passage in the mixing zone.

On October 20, 1975 Bryson of EPA wrote a letter to Miller of EPA requesting information "as soon as possible as to the national policy" on flow augmentation. Bryson said that his office was opposed to the use of "flow augmentation to achieve lower concentration in the effluent to comply with their Water Quality Standards."

On November 3, 1975 Mr. Courchaine of MWRC, pursuant to Bryson's letter to MWRC on October 1, 1975, requested from Ford "documentation to justify the use of flow augmentation" which would "show why treatment beyond [the] present proposal, BPT plus filtration, to meet water quality standards is economically and/or technically unfeasible."

In response to Bryson's request of October 20, 1975 concerning the subject of flow augmentation to achieve water quality standards, Miller on January 14, 1976 sent to Bryson his written memorandum, which memorandum concluded that flow augmentation at the Ford Plant was unacceptable. Miller stated:

> You ask whether the proposed flow augmentation to meet water quality standards is a valid approach and whether it might set a national precedent for dischargers in any area where sufficient water is available for dilution pumping. To the extent that concentration limitations alone do not control the actual amount of pollutants discharged, they may be generally considered as protection against localized acutely toxic conditions that would endanger aquatic life or serve as a barrier to free passage to up-river reaches. This being the case, achievement of concentration limits *per se* be-

comes a requirement for diffusion of the discharge and the specification of a mixing zone indicates the degree of diffusion required.

An important element of the case in question, and any similar case, is that BPT reductions or, ultimately, the BAT reductions of pollutant pounds discharged or any more stringent reductions required by load allocations must be met before flow augmentation may be allowed.

In the instant case, the upstream concentration of pollutants expressed as pounds based on total river flow *plus* the BPT allowance of pounds of pollutants discharged after dilution exceed the instream concentration limitations. We, therefore, do not see flow augmentation as being consistent with the requirements of the *in-stream* concentration limits contained in the water quality standards.

As regards to national policy and the establishment of precedent, it would not appear that any policy guideline can be laid down either flatly prohibiting or approving flow augmentation to achieve a given water quality standard, nor that the decision for or against such dilution in a given case can be cited as a precedent for a general position.

Please note that there is a definite distinction between the *effluent* concentration limits and the *in-stream* concentration limits specified in water quality standards. It must be clear however, that BPT or any more stringent limitation of pounds derived from load allocation of assimilative capacity or other water quality standards must be met before the question of flow augmentation to achieve diffusion oriented limitations can be considered.

Therefore, on January 22, 1976 Mr. Bryson of EPA informed Mr. Courchaine of MWRC by letter that MWRC's proposed permit modifications on the Ford Monroe Plant were denied. Bryson stated that

—coprecipitation and settling
—filtration
Such facilities are to be constructed from plans and specifications approved by the

Chief Engineer of the Michigan Water Resources Commission.

"[t]reatment to BPT supplemented by dilution to meet water quality standards is not compatible with the requirements of [the FWPCA]." Attached to the letter was Miller's memorandum of January 14, 1976, *supra,* as justification for EPA's action.[3] EPA stated to MWRC that Miller's memorandum made "two important points about the inconsistency of the proposed permit with national policy." These two points were stated as follows:

1. Flow augmentation is not consistent with the requirements of the instream concentration limits contained in water quality standards.

2. BPT or any more stringent limitation of pounds derived from load allocation of assimilative capacity or other water quality standards must be met before the question of flow augmentation to achieve diffusion oriented limitations can be considered.

On April 20, 1976 pursuant to § 509(b)(1)(F) of the Act, 33 U.S.C. § 1369(b)(1)(F), Ford petitioned this Court to review the January 22, 1976 decision of EPA denying the permit modifications for the Monroe Plant.

### III

■ Initially, EPA contends that actions taken by MWRC subsequent to its veto of the proposed permit modifications have mooted this case. Specifically, EPA argues that in May 1976 which was subsequent to the filing by Ford of its petition for review in this Court, MWRC decided not to continue to support the issuance of the NPDES permit on the Monroe Plant; agreed that EPA's refusal to concur in issuance was reasonable; and ordered an adjudicatory hearing to reconsider the need for the permit modifications. Therefore, EPA concludes that judicial review at this time is not appropriate because no controversy exists. It asserts that only if MWRC and/or

EPA later refuse to issue the permit modifications, after an adjudicatory hearing record has been developed, should this Court review the action of EPA.

The State of Michigan as an intervenor also requests that this Court defer ruling on EPA's denial of the permit modifications until the administrative record can be developed through an adjudicatory hearing. The State concedes that it forwarded to EPA the proposed permit modifications without an adequate factual review.

The statute at § 509(b)(1)(F) is quite clear however, in conferring upon this Court jurisdiction to review the EPA Administrator's action for denial of any permit under § 402. There is no dispute by any party that EPA denied Ford modification on its Monroe Plant permit under § 402(d)(2)(B). We hold therefore, that the Administrator's action is properly before this Court subject to review. *Mianus River Preservation Comm. v. Administrator EPA,* 541 F.2d 899, 909 (2d Cir. 1976) and *Shell Oil Co. v. Train,* 415 F.Supp. 70, 77–78 (N.D.Cal.1976). *Cf. E. I. duPont deNemours & Co. v. Train, supra,* 430 U.S. at 137, 97 S.Ct. 965. The factual record in this case has been sufficiently developed that this Court can review adequately the action of EPA.

This Court is not reviewing the action of the State of Michigan to issue the revised permit with the proposed modifications, and the FWPCA does not foreclose the State from conducting further hearings in the matter. Nevertheless, Ford is entitled under the statute to have its day in court, and post-denial action by the State of Michigan (which obviously was reacting to EPA's veto of the proposed permit modifications) neither changes the action already taken by EPA nor moots this case. An actual controversy still exists between Ford and EPA. Accordingly, we will proceed to the merits of this case.

---

**3.** On November 8, 1976 EPA through its Office of General Counsel again addressed the subject on the use of low-flow augmentation by point sources to meet water quality standards. In a memorandum addressed to the EPA Regional Administrators and the State NPDES Directors, the General Counsel's Office expanded upon Miller's memorandum into a full treatment of the subject. EPA's arguments against the general use of low-flow augmentation to meet water quality standards are repeated by its attorneys in its brief before this Court.

## IV

As noted above, the EPA Administrator has authority to refuse a NPDES permit proposed by the State if the Administrator, within ninety days of the State's transmittal of the proposed permit, objects to it in writing "as being outside the guidelines and requirements" of the FWPCA. § 402(d)(2)(B).

Ford argues that this statute provides the Administrator with but narrow review powers over a proposed permit when a State is supervising its own permit program under the FWPCA. Ford contends that EPA is exercising control over the effluent limitations in individual States on a plant-by-plant basis, even though the permits as in the present case, are not inconsistent with the published guidelines and explicit statutory requirements under the Act.

■ Although the issue as to whether the proposed permit modifications are or are not outside the guidelines and requirements of the FWPCA is the main question to be decided in this case, there is little doubt that EPA has limited review powers over the issuance of a proposed permit submitted by a State pursuant to the State's own NPDES permit program under § 402. The FWPCA does vest final review authority with the Administrator for permits issued by the states (see the *duPont* case, *supra*, at 137 n. 27, 97 S.Ct. 965) but since it was "believed that the states would shoulder the primary burden of issuing permits to individual dischargers," the "EPA duties were to be restricted to assuring that the state followed the procedural guidelines and to reviewing individual permits of major significance." *Natural Resources Defense Council, Inc. v. Train*, 166 U.S.App.D.C. 312, 329, 510 F.2d 692, 709 (1975). *See* 1972 U.S.Code Cong. & Ad.News, p. 3737. *Cf. Mianus River Preservation Comm. v. Administrator, EPA, supra.*

The permit involved raises an issue of "major significance," namely, the use of low-flow augmentation to meet water quality standards. This issue may have a major impact on many dischargers in the United States.

We now proceed to determine whether under § 10 of the Administrative Procedure Act, the Administrator's action was "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). *See Buckeye Power, Inc. v. EPA*, 481 F.2d 162, 171 (6th Cir. 1973); *Appalachian Power Co. v. Train*, 545 F.2d 1351, 1356 (4th Cir. 1976); and *Sierra Club v. EPA*, 176 U.S.App.D.C. 335, 344-45, 540 F.2d 1114, 1123-24 (1976), *cert. denied*, 430 U.S. 959, 97 S.Ct. 1610, 51 L.Ed.2d 811 (1977).

Under the "arbitrary and capricious" standard, the Supreme Court in *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 823-24, 28 L.Ed.2d 136 (1971) stated:

> [T]he court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. . . Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency. [citations omitted]

Quoted with approval in *Buckeye Power, Inc. v. EPA, supra*, at 171.

Furthermore, EPA is held to a high standard of articulation. *Id.*, quoting from *Environmental Defense Fund, Inc. v. EPA*, 150 U.S.App.D.C. 348, 360-61, 465 F.2d 528, 540-41 (1972).

Ford argues that EPA objected to the use of low-flow augmentation to meet water quality standards under the FWPCA solely upon EPA's own ad hoc policy determination as to effluent limitations at the Monroe Plant. Ford further contends that there are no published regulations, guidelines or specific statutory requirements under the FWPCA prohibiting the use of low-flow augmentation to meet water quality standards. Ford concludes therefore, that EPA exceeded its veto authority when it denied Ford the permit modification because § 402(d)(2)(B) allows EPA to object only to the issuance of NPDES permits which are

*outside the guidelines and requirements* of the FWPCA, and not upon the EPA's private policy determination. In fact, Ford maintains that EPA's action in the present case denied Ford as a permittee, its statutory right to a hearing on the issues related to the permit. Ford argues that although § 402(b)(3) provides the permittee a right to a hearing under a state's permit program, EPA in effect renders this statutory right to a hearing a nullity when it declines to issue a NPDES permit for any policy reason, rather than upon "previously promulgated generic guidelines." We believe that the main thrust of Ford's argument is well taken.

It is clear from the record in this appeal that EPA had no prior well-established agency policy which prohibited the use of low-flow augmentation to meet water quality standards. In fact, in August 1975 two EPA officials appear to have indicated initially that flow augmentation was proper. When Bryson, the Region V EPA Deputy Director, in October 1975 requested from Miller of EPA a memorandum on flow augmentation, Bryson did not even know the national policy of the agency on flow augmentation. Miller's response in a memorandum, the basis for EPA's veto of the proposed permit modifications, did not cite any statutory provision, regulation or guideline. As already noted, Miller stated:

> [I]t would not appear that any policy guideline can be laid down either flatly prohibiting or approving flow augmentation to achieve a given water quality standard, nor that the decision for or against such dilution in a given case can be cited as a precedent for a general position.

EPA's November 1976 memorandum from the office of its General Counsel, on the subject of low-flow augmentation, contains this statement:

> The [FWPCA] is silent on the question of whether this alternative is proper and legal as a method of meeting water quality standards based on concentrations.

Nonetheless, this memorandum stated that the EPA policy clearly discouraged the use of flow augmentation or dilution "as an alternative to treatment for meeting water quality standards," developing its reasoning from analogies on the statutory requirements under § 102(b)(1) of the Act, 33 U.S.C. § 1252(b)(1), and § 110(a)(2)(B) of the Clean Air Act, 42 U.S.C. § 1857c–5(a)(2)(B). Such a position would undoubtedly be a good reason for publishing regulations or guidelines in the future on this subject, but it can hardly be a justification for vetoing the proposed permit modifications in the present case when the reasoning was adopted ten months after the veto. This Court can consider only the grounds asserted by EPA in its letter of January 22, 1976 which vetoed the permit modifications.[4]

The Supreme Court in *Burlington Truck Lines, Inc. v. United States,* 371 U.S. 156, 168–69, 83 S.Ct. 239, 246, 9 L.Ed.2d 207 (1962), stated, with reference to *SEC v. Chenery Corp.,* 332 U.S. 194, 196, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947):

> The courts may not accept appellate counsel's *post hoc* rationalizations for agency action; *Chenery* requires that an agency's discretionary order be upheld, if at all, on the same basis articulated in the order by the agency itself:
>
> > "[A] simple but fundamental rule of administrative law . . . is . . that a reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency. If those grounds are inadequate or improper, the court is powerless to affirm the administrative action . . .." *Ibid.*
>
> For the courts to substitute their or counsel's discretion for that of the Commission is incompatible with the orderly functioning of the process of judicial review. This is not to deprecate, but to

---

4. The November 1976 memorandum of EPA's general counsel also failed to cite any published guidelines and regulations on the subject of the use of low-flow augmentation to meet water quality standards.

vindicate (see *Phelps Dodge Corp. v. Labor Board,* 313 U.S. 177, 197, [61 S.Ct. 845, 853, 85 L.Ed. 1271]), the administrative process, for the purpose of the rule is to avoid "propel[ling] the court into the domain which Congress has set aside exclusively for the administrative agency." 332 U.S., at 196, [67 S.Ct. 1575 at 1577, 91 L.Ed. 1995].

*See also Atchison, Topeka & Santa Fe Ry. Co. v. Wichita Bd. of Trade,* 412 U.S. 800, 806–07, 93 S.Ct. 2367, 37 L.Ed.2d 350 (1973) (Marshall, J., speaking for the plurality). *Cf. Hooker Chemical & Plastics Corp. v. Train,* 537 F.2d 620, 634, 636 (2d Cir. 1976).

Moreover, EPA's contention that Ford did not provide the necessary information to EPA or MWRC on the need for flow augmentation at the Monroe Plant and other related arguments cannot support EPA's veto because such "deficiencies" were not included in any part of EPA's veto letter. In other words, they are an afterthought.

An examination of the various statutory provisions of the FWPCA indicates that Congress among other things, directed EPA to publish guidelines and regulations setting forth the effluent limitations applicable to point sources. For example, § 304(a) required EPA to publish "criteria for water quality accurately reflecting the latest scientific knowledge" as to most aspects of water pollution and its effect on the aquatic environment, as well as to develop and publish information on the factors necessary to measure, restore and maintain water quality and to protect the aquatic environment. Section 304(b) required EPA to publish "regulations, providing guidelines for effluent limitations." Section 301(b) required EPA to publish regulations on effluent limitations for point sources. Section 302 directed EPA to publish regulations on water quality related effluent limitations where such limitations were necessary. Section 306(b) ordered EPA to "propose and publish regulations establishing Federal standards of performance for new [pollution] sources within" various industries. Section 307 required EPA to publish toxic and pretreatment effluent standards. These regulations and guidelines if violated, would serve as a basis for vetoing a NPDES permit. *Compare E. I. Dupont deNemours & Co. v. Train,* 430 U.S. 133 n. 24, 97 S.Ct. 965 (1977) *and American Iron and Steel Inst. v. EPA,* 526 F.2d 1027, 1041 (3rd Cir. 1975) *with CPC Int'l, Inc. v. Train,* 515 F.2d 1032, 1039 (8th Cir. 1975). *See also* §§ 402(a)(1) and (b)(1)(A).

EPA has not met with difficulty in publishing necessary regulations and guidelines within the time framework contemplated by Congress for most industries.

The absence of such regulations and guidelines however, as well as the lack of specific statutory requirements under the Act relating to the use of flow augmentation to meet water quality standards precludes EPA's denial of a modification on a NPDES permit as to flow augmentation under § 402(d)(2)(B) because such modification is not "outside the guidelines and requirements" of the Act. *Cf. Republic Steel Corp. v. Train,* 557 F.2d 91 (6th Cir. 1977). Without such guidelines and requirements, EPA could arbitrarily deny permit modifications and render state NPDES permit programs a farce. An industry would have difficulty in preparing its application for a permit without such guidelines. As Ford argued, a permittee would effectively be denied a hearing on issues related to the permit. In other words, EPA would be making decisions unfettered by administrative constraints, despite the congressional policy specifically providing therefor. § 101(e).

 In the present case we are unable to find *any* "guidelines and requirements" in the FWPCA, or guidelines promulgated pursuant thereto upon which EPA on January 22, 1976 relied, to deny the NPDES permit modifications on the Ford Monroe Plant. Therefore, EPA's veto action under § 402(d)(2)(B) was a clear error in judgment and was arbitrary, capricious and an abuse of discretion. Ad hoc national policy determinations developed through internal agency memoranda standing alone without promulgating regulations or guidelines through public notice and/or an opportunity

for a public hearing, are not proper procedures for EPA to enforce the FWPCA. *See Associated Indus. of Alabama v. Train,* 9 ERC 1561, 1568–69 (N.D.Ala. Dec. 6, 1976). *Cf. Natural Resources Defense Council, Inc. v. Train, supra,* 166 U.S.App.D.C. at 326–27, 510 F.2d at 706–10.

If the State of Michigan conducts further hearings on the proposed permit modifications at the Ford Monroe Plant, Ford and EPA may appear at these hearings to present their respective contentions with respect thereto.

Accordingly, EPA's veto of the proposed permit modifications at the Ford Monroe Plant is set aside. This case is remanded for further proceedings not inconsistent with this opinion.

ENGEL, Circuit Judge, dissenting.

I respectfully dissent. The practical effect of the majority opinion is to hold that if a pollution discharge is not expressly forbidden by the FWPCA, EPA regulations or state-adopted water quality standards, it is permitted.

In my opinion such a view runs counter both to the history and text of the Act, and in particular to the language of Section 301(a) of the Act, 33 U.S.C. § 1311(a), which in a straightforward manner states:

> Except as in compliance with this section and sections 302, 306, 307, 318, 402, and 404 of this Act [33 U.S.C. §§ 1312, 1316, 1317, 1328, 1342, 1344], the discharge of any pollutant by any person shall be unlawful.

The use of flow augmentation is not authorized by any of the exceptions referred to in Section 301(a) of the Act.

As pointed out in the majority opinion, Michigan adopted its water quality standards effective December 12, 1973. Because the Administrator did not express his disapproval, they became standards under the FWPCA. Section 303(c)(3) of the Act, 33 U.S.C. § 1313(c)(3). Michigan's adopted water quality standards do not provide for flow augmentation even by inference. The EPA was not accorded the opportunity to pass upon the question of flow augmentation when the standards were submitted to it, there being no suggestion that the issue was ever raised.

Ford's Monroe plant is currently subject to a permit which does not include any authorization for the use of flow augmentation as a means of meeting the applicable water quality standards. The NPDES permit issued to Ford for its Monroe plant on December 20, 1974 was not vetoed by the EPA. Only six months later, however, a modification was sent to the EPA, proposing the use of flow augmentation by Ford to meet the water quality standards for the Raisin River. The modification sought would allow Ford to draw water from nearby Lake Erie, thus raising the flow of the Raisin River at the point of discharge. The proposal would permit Ford to divert any volume of water in order to meet the concentration limits contained in the water quality standards.[1]

Taking advantage of the fact that the Michigan water quality standards are stated on a per liter basis, Ford proposes a permit modification which would allow it to dilute its pollution to achieve the water quality standards without a reduction in the amount of pollutants it discharges. With the modification Ford proposes to dump more than twice as much metallic sludge into the Raisin River as has previously been permitted.

It is true that if Michigan water quality standards do not condone, neither do they expressly condemn flow augmentation as a means of achieving acceptable concentrations of discharged pollutants. And it is

---

1. Ford originally sought approval for flow augmentation in 1971, when it applied for a discharge permit under the Rivers and Harbors Act, 33 U.S.C. § 407, the predecessor of the NPDES, Section 402(a)(5) of the Act, 33 U.S.C. § 1342(a)(5). While Ford's 1971 draft proposal projected its requirements at 137 million gallons a day, the permit modification at issue here imposes no ceiling on the quantity of water Ford could divert from Lake Erie. The modification, if approved by Michigan, would thus allow Ford to exceed even its 1971 projection to meet the state's water quality standards.

true that the Administrator's power to veto under the Act may be exercised only when a permit is "outside the guidelines and requirements" of the Act, Section 402(d)(2) of the Act, 33 U.S.C. § 1342(d)(2). On this basis the majority holds that because it is unable to find any guidelines and requirements in the FWPCA or regulations promulgated under it upon which the EPA could rely to sustain its January 22, 1976 veto of the NPDES permit modification, the action was arbitrary and an abuse of discretion.[2] It is this point at which I depart from the majority. In my view it is precisely because flow augmentation is not specifically approved as a means of achieving acceptable concentrations under Michigan's water quality standards that the EPA is justified in intervening. Further, I am unwilling to compel that agency to promulgate regulations respecting flow augmentation as a condition to exercising its veto powers upon the facts here.

To be lawful under Section 301(a) of the Act, 33 U.S.C. § 1311(a), a discharge must satisfy carefully delineated exceptions set forth in the other sections of the Act. In other words, unless a discharge of pollutants can be shown to be legal, it is illegal under Section 301(a).[3]

The effect of the majority opinion is to require the EPA to point to a regulation which outlaws the flow augmentation technique before it can act. No doubt the potential means of evading the operation of the Act are myriad if the plain command of Section 301 is to be ignored. It was, in my judgment, precisely because such loopholes

could not be anticipated that Congress couched the Act in such bold, prohibitory terms.[4]

While it is not necessary to hold that flow augmentation is implicitly forbidden by the FWPCA, there is much within the Act and its history to support such a view. Congress chose the phrase "effluent *limitation*" to describe the means for attaining water quality. Section 302 of the Act, 33 U.S.C. § 1312.[5] As we noted in *Big Rivers Electric Corp. v. EPA*, 523 F.2d 16 (6th Cir. 1975), *cert. denied*, 425 U.S. 934, 96 S.Ct. 1663, 48 L.Ed.2d 175 (1976), the concept "emission limitation" in the Clean Air Act requires regulation of "the *amount* of [a pollutant] which may be included in the emission from a given source." *Id.* at 22 (emphasis in original). A consistent construction of "effluent limitation" in the FWPCA suggests a similar intent on the part of Congress to achieve water quality by controlling quantity. Indeed, the definition of "effluent limitation" in the FWPCA denotes a concern for restricting the amount of pollutants:

The term "effluent limitation" means any restriction established by a State or the Administrator on quantities, rates, and concentrations of chemical, physical, biological, and other constituents which are discharged from point sources into navigable waters . . . . .

Section 502(11) of the Act, 33 U.S.C. § 1362(11); *See American Iron & Steel Institute v. EPA*, 543 F.2d 521, 528 (3d Cir. 1976).

Such a view is fully substantiated in the legislative history. The goals and policy of

---

2. A review of the record dispels the idea that the EPA's action usurped Michigan's role in the state-administered plan for issuing NPDES permits. This permit is the only one of 1,479 NPDES permits issued by the State of Michigan to be voted by the EPA as of December 31, 1976, indicating the agency's restrained use of its statutory veto power. This is not, therefore, a case of bureaucratic caprice run riot.

3. Obviously Section 301(a) of the Act, 33 U.S.C. § 1311(a), is a guideline and requirement of the Act which would validate the Administrator's action in disapproving the permit modification. *See American Iron & Steel Institute v. EPA*, 526 F.2d 1027, 1039–40 (3rd Cir. 1975).

4. The breadth of Section 301, of course, is altogether consistent with the national goal of the Act " . . . that the discharge of pollutants into the navigable waters be eliminated by 1985." Section 101(a)(1) of the Act, 33 U.S.C. § 1251(a)(1).

5. In addition, the nationwide system of discharge permits, which governs Ford's Monroe plant and thousands of other point sources, is formally entitled the National Pollution Discharge *Elimination* System. Section 402 of the Act, 33 U.S.C. § 1342 (emphasis added).

Congress, as declared in the statute itself, include the prevention, reduction and elimination of pollutants from the nation's water. Section 101(b) of the Act, 33 U.S.C. § 1251(b). The statute, needless to say, does not speak in terms of dilution. It is significant, however, that the Conference Committee replaced the words "abate" and "abatement" with "reduction" and "elimination" in Sections 101 and 102, 33 U.S.C. §§ 1251, 1252. S.Conf.Rep. 92–1236, 92nd Cong., 2d Sess. (1972), *reprinted in* 2 U.S. Code Cong. & Admin.News at 3778 (1972). Flow augmentation, it is agreed, simply reduces the concentration of pollutants introduced into a body of water. It does not, however, eliminate or reduce the quantity of the pollution.

A further indication of national policy is to be gleaned from Section 102(b)(1) of the Act, 33 U.S.C. § 1252(b)(1), which states:

> In the survey or planning of any reservoir by the Corps of Engineers, Bureau of Reclamation, or other Federal agency, consideration shall be given to inclusion of storage for regulation of streamflow, except that *any such storage and water releases shall not be provided as a substitute for adequate treatment or other methods of controlling waste at the source.* (emphasis added).

The flow augmentation contemplated by Section 102(b)(1) involves the release of impounded waters at a time of low flow. The Act notes that such augmentation shall not be a substitute for "adequate treatment or other methods of controlling waste at the source." [6]

The Conference Committee Report noted with respect to Section 102(b)(1):

*The Conference substitute specifically bans pollution dilution as an alternative to waste treatment.* At the same time it recognizes that *stream flow augmentation may be useful as a means of reducing the environmental impact of runoff from non-point sources.* The Conference substitute also recognizes that stream flow augmentation may be useful for recreational, navigation, and other purposes. Finally, section 102(b) [33 U.S.C. § 1252(b)] specifically sets forth that any calculation for the need for and value of stream flow augmentation to reduce the impact of pollution must be determined by the Administrator of the Environmental Protection Agency.[7] (emphasis added).

S.Conf.Rep.No. 92–1236, 92d Cong., 2d Sess. (1972), *reprinted in* 2 U.S.Code Cong. & Admin.News at 3778–79 (1972).

Without question, Ford's Monroe plant is a "point source," as defined in Section 502(14) of the Act, 33 U.S.C. § 1362(14), and is thus not within the qualified exception recognized in the Conference Committee Report. The conclusion is inescapable that the drafters of the FWPCA did not intend industrial dischargers of waste materials from point sources such as Ford's Raisin River plant to achieve statutory compliance by using dilution as a substitute for waste treatment.

The EPA's position also finds analogous support in our court's interpretation of the Clean Air Act. In *Big Rivers, supra,* the Administrator had disapproved the Kentucky state implementation plan submitted under the Clean Air Act. We upheld the Administrator's view that the dispersal of airborne contaminants was not a satisfacto-

---

**6.** The EPA takes the view that "adequate treatment" means the best available technology (BAT). Memorandum from EPA General Council to Regional Administrators and State NPDES Directors at 4 (November 8, 1976). *See generally* Section 301(b)(2) of the Act, 33 U.S.C. § 1311(b)(2).

**7.** The Act authorizes the Administrator to determine the value of flow regulation to achieve water quality:

(2) The need for and the value of storage for regulation of streamflow (other than for water quality) including but not limited to navigation, salt water intrusion, recreation, esthetics, and fish and wildlife, shall be determined by the Corps of Engineers, Bureau of Reclamation, or other Federal agencies.

(3) The need for, the value of, and the impact of, storage for water quality control shall be determined by the Administrator

Section 102(b)(2), (3) of the Act, 33 U.S.C. § 1252(b)(2), (3).

ry means of achieving emission limitations, expressly approving similar reasoning in *Natural Resources Defense Council, Inc. v. EPA,* 489 F.2d 390 (5th Cir. 1974), *rev'd in part on other grounds sub nom. Train v. Natural Resources Defense Council, Inc.,* 421 U.S. 60, 95 S.Ct. 1470, 43 L.Ed.2d 731 (1975). *See* 523 F.2d at 20–22. In *NRDC v. EPA,* the Fifth Circuit determined that the use of tall smokestacks merely achieved a dispersion of pollutants and did not limit the quantities emitted. The "tall stacks" technique was judged to be an inadequate means of attaining national primary ambient air quality standards.[8] Flow augmentation is analogous to the use of tall stacks in that it facilitates the dispersion of pollutants but does not reduce the quantity disseminated into the waters.[9]

Finally turning to the Michigan Water Quality Standards themselves, they provide that:

> [t]he water quality standards prescribed by these rules for the various designated uses of the waters of the state apply to receiving waters . . .

Michigan Water Quality Standards, Michigan Admin.Code, Part 4, Rule 323.1090. "Receiving waters" is defined therein as "the waters of the state into which an effluent is or may be discharged." *Id.,* Rule 323.1044(f). A natural construction of the terms "receiving waters" and "the waters of the state," would not normally be thought to include waters which the polluter has artificially diverted from elsewhere into the stream in order to dilute the pollution. The concentrations expressed in the water quality standards applicable to the receiving waters of the Raisin River appear wholly consistent with the Administrator's

position and are inconsistent with the manipulation of flow contemplated by Ford.

Further, I cannot agree with the majority that we should take so grudging a view of the EPA's articulated basis for the exercise of its veto. It is true, as the majority notes, that it is not for the courts to provide *post hoc* rationalization for an agency's action which that agency has not itself given. It is also, however, true that our scope of review is a narrow one and that an agency decision of less than ideal clarity will be upheld "if the agency's path may reasonably be discerned." *Bowman Transportation, Inc. v. Arkansas-Best Freight System,* 419 U.S. 281, 286, 95 S.Ct. 438, 442, 42 L.Ed.2d 447 (1974), quoting *Colorado Interstate Gas Co. v. FPC,* 324 U.S. 521, 589, 65 S.Ct. 829, 89 L.Ed. 1206 (1945). The majority opinion would appear to confine the EPA to the grounds asserted in its letter of January 22, 1976, vetoing the permit modification. However, accompanying that letter was a memorandum dated January 14, 1976, which the veto letter incorporated by reference. The January 22 letter stated:

> Flow augmentation is not consistent with the requirements of the in-stream concentration limits contained in water quality standards.

The January 14 memorandum added:

> In the instant case, the upstream concentration of pollutants expressed as pounds based on total river flow *plus* the BPT [best practicable technology] allowance of pounds of pollutants discharged after dilution exceed the in-stream concentration limitations. We, therefore, do not see flow augmentation as being consistent with the requirements of the *in-stream* concentration limits contained in the

---

**8.** National primary ambient air quality standards resemble water quality standards under the FWPCA in that both depend upon the aggregate of pollution over a given area or in a given watercourse rather than the pollution derived from any single source, *EPA v. State Water Resources Control Bd.,* 426 U.S. 200, 205 n. 12, 96 S.Ct. 2022, 48 L.Ed.2d 578 (1976) (water quality standards); *Train v. NRDC, supra,* 421 U.S. at 65, 78, 95 S.Ct. 1470 (national primary ambient air quality standards).

**9.** Congress recently amended the Clean Air Act with respect to tall stacks and other dispersion techniques. Clean Air Act Amendments of 1977, Pub.L.No. 95–95, § 123, 91 Stat. 721 (1977). As the legislative history makes explicit, Congress intended to endorse and codify the view of *Big Rivers* and *NRDC v. EPA* that dispersion is an inadequate substitute for treatment. H.R.Rep.No. 95–294, 95th Cong., 1st Sess. 91–92, *reprinted in* U.S.Code Cong. & Admin.News at 2300 (1977).

water quality standards. (emphasis in original).

The only reasonable construction of the January 14 and January 22 memoranda in the context of the EPA's veto of the proposed permit modification is that simply satisfying the best practicable technology requirement contained in effluent limitation standards would be insufficient if instream concentration limits, without flow augmentation, still could not be met.[10] This is exactly the situation contemplated by the Supreme Court in *EPA v. State Water Resources Control Board*, 426 U.S. 200, 205 n. 12, 96 S.Ct. 2022, 48 L.Ed.2d 578 (1976). The EPA thus expressed with clarity its view that the flow augmentation was not permitted by the water quality standards, which rest on in-stream concentrations of pollutants. It therefore concluded that no authority could be found in the Michigan water quality standards for enhancing the flow of a watercourse to achieve lawful pollutant concentrations. Because the water quality standards thus do not immunize the otherwise-unlawful discharge, Section 301(a) of the Act, 33 U.S.C. § 1311(a), applies to forbid the discharge.

Contrary to the view of the majority, I would hold that the path of the agency's reasoning is sufficiently clear from its veto correspondence and does not constitute a *post hoc* rationalization.

Finally, I am unable to join in attributing a legal distinction to permits of "major" and minor significance. The majority apparently concludes that the Administrator's veto will be summarily set aside if the permit is not of major significance—a conclusion which I am unable to draw from the authorities cited.[11]

Congress undoubtedly intended that, where states qualified themselves to issue NPDES permits, the great bulk of the work was to be performed by the state and that, to this extent, the EPA would be relieved of a great deal of responsibility which would otherwise be vested solely in it. This, however, is a far cry from holding that there is any statutory limitation upon the powers of the EPA under Section 402(d)(2) of the Act, 33 U.S.C. § 1342(d)(2). As the Second Circuit noted in *Mianus River Preservation Committee v. Administrator, EPA*, 541 F.2d 899, 907 (2d Cir. 1976):

Just how active a role the Administrator was expected to play in reviewing each particular State permit application is unclear from the statute itself. Section 402(d)(2) [33 U.S.C. § 1342(d)(2)], of course, gives the Administrator the power to review and reject any particular individual application for a State permit. Yet seemingly in the same breath, § 402(d)(3) [33 U.S.C. § 1342(d)(3)][12] relieves him of any duty to do either. The review power, as taken from the words of the statute, seems to be entirely discretionary. The legislative history of § 402 confirms that view and further shows that Congress intended that the Administrator should, more often than not, take no "action" with respect to proposed State permits.

I would hold, with the Second Circuit, that the review power under the Act is entirely discretionary with the EPA and is not limited to permits of major significance. The key to the system of review devised by Congress is a practical flexibility, with the EPA itself judging when the circumstances warrant its intervention. I would hold instead that any unlawful permit outside the

---

**10.** Under the FWPCA, discharge permits issued by the State of Michigan, pursuant to Section 402(b) of the Act, 33 U.S.C. § 1342(b), require the discharger to conform both to the effluent limitations promulgated by the EPA and the water quality standards adopted by the state. Section 402(b)(1)(A) of the Act, 33 U.S.C. § 1342(b)(1)(A).

**11.** The majority finds the proposed permit modification to be of major significance, apparently not because of its impact on the Raisin

River or Lake Erie but because the permit raises an *issue* of major significance, the use of flow augmentation to achieve water quality standards.

**12.** Section 402(d)(3) of the Act, 33 U.S.C. § 1342(d)(3), allows the Administrator to waive his power to veto a state-issued permit which is "outside the guidelines and requirements" of the Act.

guidelines and requirements of the Act would be the appropriate subject for a veto in the discretion of the EPA, *Appalachian Power Co. v. Train*, 545 F.2d 1351, 1358 (4th Cir. 1976). Contrary to the majority, I do not understand *Natural Resources Defense Council, Inc. v. Train*, 166 U.S.App.D.C. 312, 329, 510 F.2d 692, 709 (1975), to establish a test of "major significance" for judging the Administrator's authority in reviewing state-issued permits under Section 402(d)(2) of the Act, 33 U.S.C. § 1342(d)(2).

Had the EPA approved water quality standards for the State of Michigan expressly providing for flow augmentation, there would be much more force to the claim that its veto was arbitrary and capricious. As the majority concedes, however, the standards are silent as to flow augmentation. It is not for us to speculate that the Administrator approved or would have approved the use of flow augmentation, when such an inference is obviously inconsistent with the objectives of the Act and results in a strained construction of the water quality standards themselves.

The Administrator, in vetoing the proposed permit modification, has expressed his view that flow augmentation is an impermissible means of attaining the concentrations of pollutants contained in the water quality standards of Michigan. As our court held in *Big Rivers, supra*, "interpretations of this complex statute [the Clean Air Act] by the agency charged with administering it are entitled to great deference." 523 F.2d at 22. Similar deference should be given to the EPA's interpretation of the FWPCA and of the state water quality standards, the text of which the agency itself reviewed and approved. *American Iron & Steel Institute v. EPA*, 543 F.2d 521, 526 (3d Cir. 1976). In my view the Administrator was justified in concluding that flow augmentation was not a permissible technique for achieving water quality standards, since no express authorization in the Act or regulations can be found to support it. I would deny the petition for review and affirm the action of the Administrator.